FILED
NOV 20 2002
LARRY W. PROPES, CLERK
U. S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| AT&T Corporation and AT&T Communications of the Southern States, LLC, Plaintiffs, vs. The Public Service Commission of South Carolina; and Mignon L. Clyburn, Chairperson, Randy Mitchell, Vice Chairperson, William Saunders, Commissioner, James Blake Adkins, Commissioner, H. Clay Carruth, Jr., Commissioner, and C. Robert Moseley, Commissioner, acting in their official Capacities as commissioners of the South Carolina Public Service Commission, Defendants. | Case No. 3:02-3929-17<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

AT&T Corporation and AT&T Communications of the Southern States, LLC (hereinafter collectively referred to as "AT&T") brings this Complaint for declaratory and injunctive relief seeking a declaration that a certain order entered by the Defendants violates the Constitution of the United States and federal and South Carolina law.

## THE PARTIES

1. Plaintiffs. AT&T Corporation is a corporation organized under the laws of the State of Delaware with a principal place of business in New Jersey. AT&T Communications of the Southern States, LLC is a corporation organized under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. AT&T Corporation and AT&T

Communications of the Southern States LLC are wholly-owned subsidiaries of AT&T Corporation, which through its operating subsidiaries currently provides telecommunications service in the State of South Carolina and elsewhere.

2. Defendants. Defendants Mignon L. Clyburn, Randy Mitchell, William Saunders, James Blake Adkins, H. Clay Carruth, Jr., and C. Robert Moseley are and at all relevant times have been, Commissioners of the South Carolina Public Service Commission. These Defendants are sued in their official capacity as Commissioners who issued the orders that are the subjects of this Complaint.[1] Defendant South Carolina Public Service Commission ("SCPSC" or "Commission") is the state commission that has regulatory jurisdiction with respect to the intrastate operations of certain telecommunications carriers in South Carolina.

**JURISDICTION AND VENUE**

3. Jurisdiction. This action arises under the Communications Act of 1934, 47 U.S.C. § 151 et seq., the Telecommunications Act of 1996, 47 U.S.C. § 153 et seq., 42 U.S.C. § 1983, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, the United States Constitution, and South Carolina Code § 58-9-280. The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a). The Court has concurrent jurisdiction over the claims arising under South Carolina state law under 28 U.S.C. § 1367(a) because these claims form part of the same case or controversy.

4. Venue. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because all individual defendants reside in South Carolina, the SCPSC is located in this district, and a substantial part of the events giving rise to the claims at issue occurred in this district. The

[1] Nick Theodore, currently a Commissioner on the South Carolina Public Service Commission, was appointed to office by the Governor on July 1, 2002. Commissioner Theodore did not participate in the decisions that are the subjects of this Complaint and thus is not named as an individual defendant.

Columbia division of this district is the proper forum for this action because the Commission sits in Richland County.

**FACTUAL ALLEGATIONS**

5. Regulatory Scheme. The Communications Act of 1934 created the Federal Communications Commission ("FCC") "for the purpose of regulating interstate and foreign commerce in communication by wire and radio ...." 47 U.S.C. § 151. The Communications Act explicitly recognized a separation between regulation of interstate and international telecommunications at the federal level and regulation of intrastate telecommunications at the state level. 47 U.S.C. § 152. The Telecommunications Act of 1996 (the "Act") significantly altered the landscape of telecommunications regulation. This Act also, however, retained and recognized the fundamental distinction between interstate and intrastate telecommunications. *See, e.g.,* 47 U.S.C. § 254(f).

6. Federal Universal Service. One of the policy goals of the Act was to provide for the universal availability of telecommunications services. The Act, therefore, established a federal mechanism to provide support for universal service. To implement the Act's universal service requirements, the Federal Communications Commission has established an assessment mechanism that, in general, requires all providers of interstate telecommunications services to contribute to federal universal service support based upon total interstate and international end-user telecommunications revenues. *See,* 47 C.F.R. § 54.709(a).

7. State Universal Service. The Act also authorizes the states to create separate supplemental state support mechanisms for universal service, so long as those state mechanisms are consistent with federal mechanisms, require carriers to contribute on "an equal and nondiscriminatory basis," and do not "rely on or burden federal universal service support

mechanisms." 47 U.S.C. § 254(f). A number of states have implemented state universal service support programs consistent with the federal program. These state programs, to date, have typically respected the jurisdictional separation between interstate and intrastate regulation established by the Act and have funded state universal service support programs by assessing only intrastate telecommunications revenues to avoid burdening the federal program. A notable exception is the Oregon Public Utilities Commission's attempt to fund a state universal service program by assessing state and interstate revenues. This attempt was declared an unlawful burden on the federal universal support mechanism by the U. S. District Court in *AT&T Communications, Inc. v. Eachus*, 174 F.Supp.2d 1119 (D. Or., Oct. 18, 2001) (No. 00-6397-HO).

8. South Carolina Scheme. Under S.C. Code § 58-9-280(E), the SCPSC is provided authority to implement a state universal service fund. The statute specifically requires that the South Carolina universal service program shall be consistent with the Federal Act. On June 6, 2001, the SCPSC issued an order (Docket No. 97-239-C, Order No. 2001-419) determining that funding of the South Carolina universal service program would be based on a surcharge on intrastate and interstate retail telecommunications revenues. The Commission entered a further order (Order No. 2001-704) denying reconsideration of Order No. 2001-419 on August 31, 2001. On October 10, 2001, the SCPSC entered another order (Order 2001-996) approving "Guidelines For South Carolina Universal Service (USF)" and "South Carolina Universal Service Fund Administrative Procedures" that require the state universal service program be based on assessments on carriers' intrastate and interstate retail revenues. These Orders are attached to this Complaint as *Exhibit A* (Order No. 2001-419), *Exhibit B* (Order No. 2001-704), and *Exhibit C* (Order 2001-996) and are the Orders challenged by this Complaint.

9. Injury to Plaintiffs and Others. AT&T is aggrieved by these Orders because they require AT&T to contribute to the South Carolina USF on its interstate and international telecommunications revenues sold in South Carolina at the same time that AT&T must pay a portion of these revenues in support of the federal universal service fund. In addition, the Orders have a discriminatory and inequitable impact on the business of carriers, such as AT&T, that largely provide interstate and international telecommunications services in South Carolina and their interstate and international customers.

## CAUSES OF ACTION

### FOR A FIRST CAUSE OF ACTION
### (The Orders Are Contrary To Federal Law)

10. AT&T incorporates by reference the allegations contained in the previous paragraphs as if fully re-alleged herein.

11. The Orders are inconsistent with federal law and rely on and burden the federal universal service mechanism in violation of the Act and create a contribution mechanism that is neither equitable nor nondiscriminatory. The Orders are contrary to 47 U.S.C. §§ 254(f) and 253(a) and are contrary to the scheme of federal/state regulation provided by 47 U.S.C. § 152. This violates the Supremacy Clause of the United States Constitution, Article VI.

### FOR A SECOND CAUSE OF ACTION
### (The Orders Improperly Burden Interstate Commerce)

12. AT&T incorporates by reference the allegations contained in the previous paragraphs as if fully re-alleged herein.

13. The Orders improperly burden interstate commerce by subjecting AT&T and other telecommunications carriers to the risk of multiple taxation. The Orders also have a discriminatory and inequitable impact on the business of carriers that predominantly provide

interstate and international telecommunications services in South Carolina and their interstate and international customers. Because of these infirmities, the Orders violate the Commerce Clause of the United States Constitution.

**FOR A THIRD CAUSE OF ACTION**
**(Violation of State Law)**

14. AT&T incorporates by reference the allegations contained in the previous paragraphs as if fully re-alleged herein.

15. The SCPSC acted outside of the authority provided to it by South Carolina statutes in entering the Orders. South Carolina Code Title 58, Chapter 3 extends the SCPSC's authority only to intrastate telecommunications. These statutes do not confer upon the SCPSC the authority to regulate and tax interstate and international telecommunications. In addition, the Order violates the provisions of the statute establishing the universal service fund that the fund be "consistent with applicable federal policies." *See* S.C. Code § 58-9-280(E). As established by the Orders, the South Carolina fund is not competitively neutral, it relies on and burdens the federal universal service mechanism in violation of the Act, and has a discriminatory and inequitable impact on the business of carriers that largely provide interstate and international telecommunications services in South Carolina and their interstate and international customers.

**FOR A FOURTH CAUSE OF ACTION**
**(Injunctive Relief)**

16. AT&T incorporates by reference the allegations contained in the previous paragraphs as if fully re-alleged herein.

17. AT&T is entitled to injunctive relief against the SCPSC, including but not limited to preliminary injunctive relief during the pendency of this action, and permanent injunctive relief subsequent to the resolution of this action to eliminate any irreparable harm, or inequitable

or unjust advantage arising from the discriminatory and inequitable impact of the SCPSC's Orders on AT&T.

18. AT&T is further entitled to injunctive relief against the SCPSC because there is no adequate remedy at law to address the discriminatory and inequitable impact of the SCPSC's actions.

**PRAYER FOR RELIEF**

WHEREFORE, AT&T seeks:

1. A declaratory judgment that the Orders violate federal law including the Supremacy Clause and Commerce Clause of the United States Constitution and the Communications Act of 1934, as amended, along with a judgment that the Orders violate statutes of the State of South Carolina;

2. An injunction preventing collection of South Carolina Universal Service Program assessments against interstate and international revenues;

3. An Order requiring the South Carolina Public Service Commission to recalculate all prior assessments only on the basis of the carrier's proportionate shares of intrastate revenues;

4. An award of costs and attorneys' fees; and

5. Such other relief as this Court deems just and reasonable.

This the 20th day of November, 2002.

Respectfully submitted,

Brent O. E. Clinkscale (Fed ID No. 5155)
Jacquelyn D. Austin (Fed ID No. 6837)
WOMBLE CARLYLE SANDRIDGE & RICE
*a Professional Limited Liability Company*
104 South Main Street, Suite 700
P. O. Box 10208
Greenville, SC 29603-0208
(864) 255-5408

Attorneys for Plaintiffs

GREENVILLE 41343v2

# EXHIBIT A

BEFORE

THE PUBLIC SERVICE COMMISSION OF

SOUTH CAROLINA

DOCKET NO. 97-239-C – ORDER NO. 2001-419

JUNE 6, 2001

| | | | |
|---|---|---|---|
| IN RE: | Proceeding to Establish Guidelines for an Intrastate Universal Service Fund. | ) ) ) | ORDER ON UNIVERSAL SERVICE FUND |

## I. INTRODUCTION

This matter comes before the Public Service Commission of South Carolina (the Commission) pursuant to Order No. 2000-0177, in which this Commission found that it should proceed with an investigation of the various aspects related to the implementation of the intrastate Universal Service Fund (USF), and pursuant to the February 10, 2000 Petition of the South Carolina Telephone Association (SCTA), which requested that this Commission proceed with the implementation of the intrastate Universal Service Fund.

Our Order No. 2000-0177 stated that we would receive information and testimony concerning, but not limited to the following issues:

1) the need for immediate implementation of the intrastate Universal Service Fund;

2) the proposed funding mechanism related to the intrastate Universal Service Fund;

3) the proposed methods for implementing a phase-in of the intrastate Universal Service Fund;

4) the impact on rural areas if the intrastate Universal Service Fund is not implemented in some form;

5) the determination as to which telecommunications carriers shall be required to contribute to the intrastate Universal Service Fund; and

6) the issues set out in the South Carolina Telephone Association's Petition which proposes a plan for implementation.

We also noted that parties who were already parties of record and participated in earlier proceedings under this Docket would be considered parties in this USF implementation proceeding.

Accordingly, a public hearing was held on the matter beginning on July 17, 2000, at 11:00 AM in the Commission's hearing room. The Honorable William Saunders, Chairman, presided. The first day of the hearing was devoted to hearing the concerns of the members of the public on USF. The evidentiary hearing began on July 18, 2000, and continued through July 21, 2000.

The Petitioners were represented as described hereinafter. The South Carolina Telephone Association and the South Carolina Telephone Coalition (SCTC) were represented by M. John Bowen, Jr., Esquire, and Margaret M. Fox, Esquire. BellSouth Telecommunications, Inc. (BellSouth) was represented by William F. Austin, Esquire, Philip Carver, Esquire, and Robert Culpepper, Esquire. GTE South, Inc. (GTE) was represented by Steven W. Hamm, Esquire. (BellSouth and GTE are members of the South Carolina Telephone Association.)

The Intervenors were represented as follows. The Consumer Advocate for the State of South Carolina (the Consumer Advocate) was represented by Elliott F. Elam, Jr., Esquire and Charles Knight, Esquire. The South Carolina Cable Television Association (SCCTA) and the Southeastern Competitive Carriers Association (SECCA) were represented by Frank R. Ellerbe, III, Esquire. WorldCom was represented by Darra W. Cothran, Esquire, Kennard B. Woods, Esquire, and Janet Butcher, Esquire. AT&T Communications of the Southern States, Inc. (AT&T) was represented by Gene Coker, Esquire, and Steve A. Matthews, Esquire. The South

Carolina Public Communications Association (SCPCA) was represented by John F. Beach, Esquire and John J. Pringle, Jr., Esquire. Sprint-United was represented by Richard L. Whitt, Esquire, James B. Wright, Esquire, and Tim Slabouz, Esquire. The South Carolina Budget and Control Board was represented by Craig K. Davis, Esquire and Brian Johnson, Esquire. LCI International was represented by Faye A. Flowers, Esquire. ALLTEL and ACI were represented by D. Reece Williams, III, Esquire. Verizon Wireless was represented by John M.S. Hoefer, Esquire. Crown Castle USA, Inc. was represented by Daniel B. Lott, Esquire. The Commission Staff was represented by F. David Butler, General Counsel.

Not appearing during the hearing were the Intervenors Alliance for South Carolina's Children, South Carolina Fair Share, the Women's Shelter, John C. Ruoff, PhD, e*spire Communications, Pro-Parents, and ITC^DeltaCom.

The Petitioners SCTA, SCTC, BellSouth, and GTE presented the direct testimony of Peter F. Martin, H. Keith Oliver, Alan L. Mason, Terry R. Dye, Henri Etta Baskins, and Emmanuel Staurulakis, and the rebuttal testimony of H. Keith Oliver. The parties stipulated into the record the rebuttal testimony of Peter F. Martin, Emmanuel Staurulakis, Jerry Hendrix, and Robert McKnight.

The intervenor Consumer Advocate presented the testimony of Allen G. Buckalew. SCCTA and SECCA presented the testimony of Joseph Gillan. AT&T presented the direct testimony of Richard Guepe and Gregory J. Tate. The parties also stipulated into the record the surrebuttal testimony of Richard Guepe. The South Carolina Public Communications Association presented the testimony of Walter Rice. Sprint-United presented the direct testimony of James Appleby. The parties also stipulated into the record Appleby's surrebuttal testimony.

ALLTEL and ACI presented the testimony of Darrell L. Mennenga. The Commission Staff presented the testimony of Gary E. Walsh.

## II. SUMMARY OF TESTIMONY

After hearing from numerous members of the public with varying viewpoints, the Commission held a full evidentiary hearing on Universal Service and the Universal Service Fund. A summary of testimony of the various witnesses follows herein.

### Peter F. Martin

Peter F. Martin of BellSouth Telecommunications, Inc. testified on behalf of the South Carolina Telephone Association. (Tr., Vol. II, Martin, at 255-406.) Martin discussed the concept of Universal Service and described prior proceedings related to Universal Service that were held before this Commission and the Federal Communications Commission (FCC). Martin noted that this Commission has held two prior proceedings to address the Fund. The first proceeding adopted guidelines required by South Carolina statute. The guidelines, among other things, define the services supportable under the Universal Service Fund, define eligibility requirements for receiving funding, establish administration of the fund, and declare that funding is affordable to any qualified carrier of last resort. The second proceeding addressed a selection of appropriate cost models and methodologies, and also sized the fund. The Commission adopted a forward-looking cost model and inputs for BellSouth, GTE, and United. An embedded cost model proposed by SCTC for rural local exchange carriers (LECs) other than United was also adopted.

Martin proposes that we now implement the fund, using the phased implementation plan proposed by SCTA. According to Martin, this plan presents an opportunity for this Commission to manage and enhance the transition to full competition, and to protect Universal Service by

keeping basic rates affordable. Martin states that consumers will benefit from the establishment of a State Universal Service Fund because it will ensure that affordable service is preserved in all areas. Martin also notes that the Fund will help stimulate competition in high cost areas, especially in the residential markets. Martin testified that the present methodology for support of Universal Service cannot be sustained in a competitive environment.

Martin concluded by stating that this Commission has dealt with many of the difficulties inherent in setting up the Universal Service Fund, but that this Commission needs to move forward and implement the first steps of the Fund, and approve a process for implementing future steps. Martin believes that this action will help ensure the availability of affordable basic service for South Carolina consumers for many years to come.

**H. Keith Oliver**

Oliver introduced SCTA's plan for implementation of the South Carolina Universal Service Fund. (Tr., Vol. III, Oliver, at 419-602.) Oliver gave a historical background for establishment of the Fund, and noted that the Commission has deferred actions on issues contained in three sections of the South Carolina USF guidelines: Section 8, dealing with recovery of contributions; Section 9, dealing with the size of the South Carolina USF Fund; and Section 11, dealing with rates.

Section 8 deals with the recovery of contributions. Section 11 provides that the Commission may conduct an investigation and determine the appropriate single-party residential and single-line business rates for services within this State. Section 9 contains details of the SCTA's plan to implement the South Carolina Universal Service Fund. According to Oliver, the proposed plan is a means to continue to protect affordable basic local telephone service in South

Carolina. He also states that it is a competitively neutral way to allocate the burden of supporting Universal Service within South Carolina. Finally, Oliver states that the plan grants full control and flexibility over the State USF, and addresses reductions both in rates for wholesale users, as well as the rates charged directly to retail end users.

Oliver notes that SCTA' s Plan calls for three phases. The first step requires an immediate reduction of 50 percent in intrastate access rates, and provides for the full funding of the State' s Lifeline program for low-income consumers. This means that the State USF will fund Lifeline to the amount necessary to take advantage of the maximum amount of Federal matching funds available for those services to low-income subscribers. Step 2 of the first phase requires local exchange carriers (LECs) to file tariff reductions on April 1, 2001, in order to begin the process of removing implicit support from other rates that contain implicit support. Under SCTA' s Plan, this Commission would have up to five months to examine the proposed rate reductions. The two steps together would be limited to no more than one-third of the total South Carolina USF.

According to Oliver, Phase 2 and 3 of the SCTA' s Plan are similar to the second step of phase one. Each phase would require tariff filings to reduce rates in compliance with Section 4 of the guidelines, which have been previously approved. Section 4 mandates that carriers of last resort make dollar-for-dollar rate reductions before being permitted to draw funds from the South Carolina USF.

Once more, the Plan provides up to five months for the Commission to evaluate the requested reductions. Phase 2 would be limited to not more than two-thirds of the total USF, and phase 3 would allow for full implementation. Oliver opines that this phase-in process allows the Commission the flexibility to implement USF as appropriate based on company specific

circumstances and taking into consideration actions on the Federal level. Any LEC not requesting full USF funding by April 1, 2003, would continue to follow the process of filing tariffs as appropriate as outlined in phases 2 and 3.

Oliver also states that the SCTA Plan allows the Commission to break down the implementation process of the South Carolina USF into a manageable process, allowing for close observation of its impact on consumers. Oliver notes that the Plan anticipates the normal review process required of all tariff provisions. The Commission has the opportunity to fully investigate any proposed reductions, along with any data filed in support of those reductions.

Further, Oliver testified that the SCTA Plan requires the submission of updated cost studies prior to USF withdrawals exceeding 50 percent of the total South Carolina Universal Service Fund, again, allowing the Commission complete control over the process. The Commission has the ability to monitor and control every dollar allowed into the State USF.

In conclusion, Oliver asks that the Commission grant the SCTA Petition as filed, and that we approve the final three issues contained in the SCTA USF guidelines in order to implement the State Universal Service Fund.

**Alan Mason**

Alan Mason of GTE testified also on behalf of SCTA. (Tr., Vol. III, Mason, at 609-651.) Mason explained the SCTA's proposed administrative procedures, based upon previously-approved by the Commission USF guidelines, and procedures included in SCTA's Petition in this case. Previously approved guidelines include the manner in which contributions will be made to the Fund, distributions which will be received from the Fund, and responsibilities of and duties to be performed by the Fund administrator. Next, the procedures specify the time frames

and data requirements to initially implement the Fund for the ongoing contributions to and distributions from the Fund. The administrative procedures also provide the administrator with a form to be completed by contributions, and one to be completed by carriers of last resort to support Lifeline support provided to South Carolina consumers.

Further, Mason noted that the procedures provide for the maximum amount of Federal support to eligible low-income South Carolina consumers that will continue to make basic telephone service affordable for Lifeline customers. This Federal support amount, when combined with a low-income component of the South Carolina Fund, will provide eligible customers with support amount of $10.50 or $11.35, depending on their local service provider. Next, the procedures delineate the responsibilities and duties of the Fund administrator, and, lastly, according to Mason, ensure the fair and competitive implementation and ongoing administration of the fund.

Accordingly, Mason recommends that this Commission adopt the SCTA' s proposed administrative procedures for use in the implementation and ongoing administration of the South Carolina Universal Service Fund.

**Terry Dye**

Terry Dye of GTE also testified. (Tr., Vol. III, Dye at 651-671.) Dye presented SCTA' s Plan for the recovery of USF contributions. Dye also explains the switched access rate reductions GTE would implement in SCTA' s first-step proposal to move implicit Universal Service support to an explicit fund. Dye notes that SCTA' s proposed guideline 8 authorizes telecommunications carriers to recover their South Carolina USF contributions through an explicit surcharge on retail

customers' bills. The surcharge would be developed by the administrator and applied to retail revenue for telecommunication services billed to retail customers.

Dye states his belief that the surcharge is an efficient, fair, and competitively neutral method for the collection of Universal Service funding. The surcharge, according to Dye, meets the Act's requirement to make Universal Service support explicit. Dye notes that the SCTA Plan is revenue neutral, and under that plan any explicit support received for the maintenance of Universal Service will be offset with corresponding reductions in services currently providing the support.

Dye notes that one of the services currently providing implicit support is switched access. With respect to the switched access reductions, GTE proposes to reduce the current composite two-way intrastate switched access rate from approximately 6 cents to 3 cents. This reduction will remove approximately $4.4 million in implicit subsidies, according to Dye. Dye further states that consumers will benefit from this reduction as area interexchange carriers flow through these reductions through lower intrastate toll charges, and GTE does not get any new revenues from the restructuring of Universal Service support. Finally, Dye recommends that this Commission adopt Guideline 8 and approve GTE's proposed access reductions.

**Henri Etta Baskins**

Henri Etta Baskins, a Manager in Regulatory and Governmental Affairs for BellSouth, testified in support of SCTA's plan for the implementation of the State Universal Service Fund. (Tr., Vol. III, Baskins, at 671-756.) Ms. Baskins first states that the current system, wherein artificially high-priced services subsidize residential service, is being eroded at an ever-increasing rate. Ms. Baskins notes that competitors are taking away the services that presently

provide Universal Service support, which therefore removes implicit support from the system. Baskins states that without a Universal Service Fund as proposed by SCTA, these competitive pressures will force basic rates upward, in some cases, dramatically. According to Ms. Baskins, the SCTA plan is simply a rearrangement of the existing implicit support system to make one that is explicit, predictable, and neutral. She also testified that a State USF is necessary so that all telecommunications providers, and not just ILECs, share the obligation and cost of maintaining universal service.

Baskins points out that any competitor that assumes the obligation to serve all customers in a designated area is entitled to recover from the fund as a cost of providing those services. Baskins also notes that BellSouth supports SCTA's phased approach to the implementation of the Universal Service Fund. Under this approach, the Commission will be able to review every request for support from the Universal Service Fund, and these reviews will ensure that the fund is properly sized before full implementation. In addition, Baskins notes that the Plan allows the Commission to assess the impact each step has on South Carolina consumers, which should alleviate the concern of sudden rate increases on consumer bills.

BellSouth proposes to remove $22.76 million of implicit Universal support in the first step of this process. BellSouth will apply this amount to access rates, reducing the composite rate from 6 cents to 3 cents. Baskins notes that if the long-distance companies pass through the access reduction to their end users, consumers should benefit by paying lower long-distance charges. Baskins states that the SCTA Plan provides for explicit support of Universal Service, while at the same time providing for competitive neutrality. Accordingly, Baskins states that BellSouth recommends that this Commission adopt the SCTA proposals.

**Emmanuel Staurulakis**

Emmanuel Staurulakis, a consultant, testified on behalf of the South Carolina Telephone Coalition. (Tr., Vol. IV, Staurulakis, at 766-833.) Staurulakis testified that it was important to have a State Universal Service Fund in order to continue the availability of affordable basic local service to the subscribers of the coalition companies. He also described the intrastate access rate reductions proposed by the coalition companies in compliance with the first phase of the Plan, and the methodology to be utilized in updating the amount of available State USF for each coalition company.

Staurulakis testified that the companies belonging to the South Carolina Telephone Coalition have been designated as carriers of last resort by this Commission, and as such, they have accepted the obligation of providing affordable basic local service to all customers within their designated service territories. Staurulakis notes that in order to keep basic local service rates affordable, the Coalition Companies rely heavily on the implicit support provided by the intrastate access charge rates, previously approved by the Commission and charged to the interexchange carriers, such as AT&T and WorldCom, for the origination and termination of intrastate telephone calls.

With the passage of the Telecommunications Act of 1996, competition has continued to evolve in both urban and rural areas throughout the country, according to the witness. Staurulakis noted that in rural areas, including rural areas of South Carolina, competition has evolved with respect to those services that provide high levels of implicit support and allow coalition companies to maintain affordable basic local service rates to their subscribers. Staurulakis described various methods by which subscribers have been able to bypass the toll network that

has historically provided implicit support to coalition companies, and further states that without a State Universal Service fund to assist in the recovery of these dollars, the ability of the Coalition Companies to maintain affordable basic local service rates is threatened.

In order to meet the Universal Service requirement of removing implicit support from the current intrastate access rate structure, the Coalition Companies propose reducing the permitted composite intrastate access rate by approximately 50 percent, from 6 cents to 3 cents per minute. This reduction in the composite permitted intrastate access rate is consistent with the reductions proposed by BellSouth and GTE, and, according to Staurulakis, results in no additional revenue to the Coalition Companies. Utilizing actual calendar year of 1999 intrastate access minutes of use, the annual access rate reduction computed for the coalition companies will be approximately $8.3 million. Stauralakis cited savings to business and residential customers due to lower intrastate toll rates. The witness further stated that lower access charge rates should provide an incentive to the interexchange carriers to offer their most competitive toll calling plans in the areas served by the coalition companies.

To calculate the amount of annual State Universal Service Fund per line, the Coalition Companies plan to utilize the embedded cost per line amounts previously approved by the Commission. The monthly cost-per-line figure is then reduced by an amount representing the current tariff rate for basic local service approved by the Commission, the current level of Federal USF payments received, and the FCC approved maximum Subscriber Line Charge in arriving at the net state USF per-line amount for each coalition company.

According to Staurulakis, the Coalition Companies support the SCTA proposal for use of a percentage surcharge to fund the USF in South Carolina. The theory is that use of a percentage

surcharge will ensure that all telecommunication users in South Carolina contribute to a State USF in an equitable manner.

Staurulakis opines that the creation of a State USF is critical to the Coalition Companies and their ability to maintain carrier-of-last-resort obligations and to continue to provide basic local telephone service at affordable rates. Stauralakis requests that this Commission create a State USF consistent with the SCTA Plan.

**Allen G. Buckalew**

Allen G. Buckalew, Consultant, testified on behalf of the Consumer Advocate. (Tr., Vol. IV, Buckalew, at 845-910.) Buckalew proposes that this Commission first determine the current earnings and costs of each telephone company that wants to draw from the Universal Service Fund, including a determination as to how much of each companies' joint and common costs should be allocated to local exchange services and other services. Buckalew stated that the investigation should also include whether existing rates are adequate or whether rate changes are needed in the company's tariffs before it draws from the fund. Once the company's rates and costs are examined, then the Commission can determine the maximum allowable rate for USF purposes. Buckalew states that the USF should not be used "to prop-up excessive profits." Further, Buckalew believes that the Commission should open a proceeding to reexamine USF cost methods, in a manner consistent with the Federal USF method and various court decisions. Buckalew then recommends implementation of these methods by the companies.

In the alternative, if the Commission continues use of the Benchmark Cost Proxy Model 3.1 (BCPM 3.1) and the embedded costs for rural companies, Buckalew further recommends that each company present its costs. The Commission can then determine the intrastate USF need.

Buckalew states a belief that the proposal before the Commission in this proceeding is tantamount to a request to increase local exchange rates without any cost or revenue requirement justification. Buckalew states that the SCTA plan has proposed how to collect the Fund without any demonstration of the need or size of the Fund.

Finally, Buckalew opines that the SCTA proposal assumes that the 3 cent rate will provide South Carolina with initial funds for Universal Service support while toll rates are decreased, but that there is no guarantee that toll rates will decrease. Further, Buckalew theorizes that the 3 cent rate may provide an over-abundance or insufficiency of funds for individual companies. He states that the Commission will not know this until it has scrutinized the various companies' cost studies and compared those costs to current rates. Buckalew believes that, upon completion of that process, the Commission can then ascertain a proper USF funding level.

**Richard Guepe**

Richard Guepe, is employed by AT&T Communications of the Southern States, Inc. (AT&T) as a District Manager in the Law & Government Affairs organization. (Tr., Vol. IV, Guepe at 845-998.) Guepe testified that a Universal Service high-cost fund is not required at this time. Guepe states that there is no "clear and present danger," to Universal Service in South Carolina, even though SCTA is requesting the approval of a $340 million high-cost fund. Guepe further notes that competition must have been enabled before the need arises for high-cost support. Guepe theorizes that in the present situation, there are no competitive forces eroding incumbent local exchange carrier (ILEC) revenues, and thereby threatening the availability of local service. Also, Guepe states his belief that when the means for competition are not readily

available, widespread competition cannot develop and concerns about ensuring Universal Service are theoretical.

Guepe testified that only carriers of last resort are eligible to receive Universal Service high-cost support. Where unbundled network elements (UNEs) are not available, according to Guepe, the ILEC can effectively prevent new companies from qualifying as a carrier of last resort, and therefore preclude them from drawing monies from the fund.

Competitive neutrality is an important principle in the establishment of any USF, according to Guepe. Guepe states that to ensure such neutrality, when a CLEC wins a customer, it should receive the same subsidy from the USF as the incumbent. The witness believes that any restrictions on support when a CLEC provides service via UNEs should be removed.

Guepe also states a belief that this Commission should modify the guidelines to permit the full amount of any subsidy, if the Commission implements a subsidy, to move with the customer rather than allowing a portion to be maintained by the incumbent carrier.

Further, Guepe urges this Commission to review the cost determinations that were previously made on USF. Guepe states that the data is stale, and there is a discrepancy in the cost developed by the BCPM model and the Federal model approved by the FCC. In addition, the witness suggests that this Commission should also reconsider the current methodology to allocate USF costs to telecommunication service providers. Guepe notes that a recent Fifth Circuit Court of Appeals case determined that the FCC did not have authority to assist carriers based on combined interstate and intrastate revenues. Guepe believes that this premise works both ways, only intrastate revenue should be used to determine State Fund Assessments.

The witness requests additional clarification as to what lines are eligible to receive high-cost support. Guepe notes that the subsidy need has been determined to be based on the cost and revenue related to basic local exchange service. The BCPM model includes the full cost of the local loops and switch. Guepe states that the local loop and switch provide many different services in addition to basic local exchange service. The witness concludes by stating that lines that provide only basic service should be eligible for support.

**Gregory Tate**

Gregory Tate, Manager-Access Management for AT&T also testified. (Tr., Vol. IV, Tate, at 998-1019.) Tate states that if funds are identified for rate reductions as a result of this proceeding, the Commission should utilize available revenue for the purpose of reducing switched access charges. Tate notes that switched access charges include mark-ups above cost that are significantly higher than current mark-ups on any other major revenue producing services offered by the local exchange carriers.

Tate opines that the Commission should move toward the complete elimination of the carrier common line charge (CCL), which Tate states is an element with zero underlying cost, and to further reduce the charges associated with the remaining switched access elements to forward looking economic cost. Tate opines that the resulting effect of lower intrastate toll calls would benefit South Carolina consumers on every in-state toll call.

**Walter Rice**

Walter Rice, President of the South Carolina Public Communications Association (SCPCA) testified. (Tr., Vol. IV, Rice, at 1020-1042.) SCPCA is an association of payphone service providers. Rice presented two major points. First, Rice states a belief that the USF

guidelines must be modified to ensure that payphone service providers do not contribute twice to the Universal Service Fund, once as a percentage of end-user revenues and again as a percentage of local and long distance telephone service bills. Second, Rice states that this Commission should lower BellSouth's rates for the payphone lines to adjust for BellSouth's receipt of the Federal Primary Interexchange Carrier Charge, commonly referred to as the PICC, and the subscriber line charge referred to as the SLC.

**James A. Appleby**

James A. Appleby, Senior Manager-Regulatory Policy for Sprint/United Management Company (Sprint) testified representing the interests of United Telephone Company of the Carolinas. (Tr., Vol. IV, Appleby, at 1042-1069.) Sprint's perspective is that of an IXC, a wireless carrier, a CLEC, and an incumbent LEC. Sprint's proposal is as follows: (1) Begin with the transition of implicit subsidies to explicit funding through implementation of phase-1/step-1 of the SCTA proposal, which includes full implementation of a State matching of Lifeline. Removing implicit subsidies from ILEC access services further stimulates competition for toll services, according to Appleby. Sprint is concerned that the additional steps of the SCTA proposal will result in an explicit fund that is too large and too burdensome in the short-term on the telecommunications customers of South Carolina. (2) At the same time as phase-1/step-1 of the SCTA proposal is implemented the Commission should initiate a proceeding on the affordability level of local service. Sprint believes that the size of the explicit subsidy can be minimized if the current local service rates are determined to be below the level that the Commission established as affordable and adjusted accordingly. (3) The Commission should reevaluate the cost of Universal Service determined earlier in this USF proceeding. Sprint notes

that the modeling was based on 1996 and 1997 data, and should be refreshed before moving forward with additional US funding. Unlike the SCTA proposal, however, Sprint believes that the reevaluations of the cost should occur after the initial phase-1/step-1 access reductions, and after the suggested affordability proceeding has concluded.

**Darrell Mennenga**

Darrell Mennenga, Staff Manager-State Government Affairs for ALLTEL Communications Service Corporation testified before the Commission. (Tr., Vol. IV, Mennenga, at 1069-1115.) Mennenga stated that in establishing the USF, the Commission must ensure that it meets the need for an adequate fund when necessary, but avoids the creation of a fund which is larger than necessary. According to Mennenga, the Commission is required to establish a mechanism to provide for a State USF in South Carolina to meet the primary objectives of Universal Service, i.e. to provide affordable basic local exchange service throughout South Carolina, and to maintain reasonable comparable service and rates between rural and urban areas. Mennenga suggests that the Commission approve guidelines that provide a means for it to evaluate the USF applications of those requesting funds to determine if they are necessary to meet these USF objectives.

Also according to Mennenga, although the SCTA proposal provides for a $340 million fund that would be available to ILECs through a tariff filing procedure, it does not provide for an application process that would allow the Commission to determine if such proposed rate reductions and offsetting contributions from the USF are necessary to maintain Universal Service.

Mennenga notes that SCTA's proposal is not necessary at this time because there has been no factual evidence presented to show that competition threatens Universal Service. Mennenga suggests that his proposed application process will allow the Commission to determine whether or not requests by carriers of last resort for reduced rates and offsetting Universal Service Fund disbursements are indeed necessary and adequate to ensure the continued provision of Universal Service. Mennenga states that the proposal of the SCTA in this proceeding could result in a fund that would be much larger than necessary, and that the Commission must balance the maintenance of Universal Service in South Carolina against possibly burdening the consumers of the State.

**Gary E. Walsh**

Gary E. Walsh, Executive Director of the Commission, also testified. (Tr., Vol. IV, Walsh, at 1115-1167; Vol. V at 1187-1264.) Walsh reviewed all prior actions taken by the Commission in the Universal Service Fund Docket. Walsh also reviewed the implementation plan filed by SCTA, stating that SCTA's Petition proposes a series of steps or phases leading to the full implementation of the USF. Walsh supports phase -1, step-1, of the SCTA plan, which would reduce intrastate access charges in South Carolina from 6 cents to 3 cents per minute. Walsh's support is based in part on a review of intrastate access rates in neighboring Southeastern states. The 6 cents per minute rate currently approved exceeds virtually all other approved intrastate access rates in the southeast region. An approximate 50% reduction in intrastate access charges should result in considerable savings to South Carolina consumers, should competition force these savings through to South Carolina long distance consumers, according to Walsh. Walsh also notes that a reduction in the intrastate access rates to 3 cents per

minute should reduce the potential for by-pass by interexchange carriers (IXCs). Walsh further states that by lowering the intrastate access rates as proposed by SCTA, the Commission enhances the continuation of an intrastate revenue source that may continue to provide universal support even at the reduced rate of 3 cents per minute. Walsh also proposes inclusion of funding of the Lifeline program in South Carolina as part of the initial USF implementation phase.

Enhancing competition and maintaining affordable local rates in high cost areas are conflicting goals, according to Walsh. As competition lowers the prices for telecommunications services that have been priced above costs, the subsidies provided by the services to support affordable local rates in high-cost areas decline. Walsh states that, to the extent that the goal of enhancing competition is achieved, it has an adverse impact on attaining the goal of maintaining affordable local rates in high-cost areas. Accordingly, Walsh believes that this Commission should not approve the structure proposed by the SCTA regarding phase-1/step-2, phase-2, and phase-3 without first making a determination as to the impact of competition in local telecommunications markets in South Carolina. Walsh states that once the Commission has made a determination as to the impact competition has made on existing implicit subsidies, then and only then should the Commission proceed with the consideration of additional end user rate reductions.

Walsh recommends that all telecommunications carriers and other providers offering telecommunications service within South Carolina contribute to the USF, unless exempted by Federal or State law. Walsh recommends an explicit surcharge on retail consumers' bills, should telecommunications carriers or providers choose to recover USF contributions from end users. Walsh recommends that the explicit surcharge be calculated by dividing the annual contribution

to be recovered by the total retail revenue billed to all end users of telecommunications services. Further, Walsh recommends an annual review of the surcharge.

Walsh believes that the prospect for facilities-based competition in the rural areas of South Carolina in the near future is remote, even if the Commission was to fully implement the State USF. This appears to be especially true for residential customers. None of the CLECs certified by the Commission have sought Carrier of Last Resort status that would allow them to receive USF support. For the most part, Walsh notes that CLECs in South Carolina have chosen not to compete in areas served by rural carriers. Accordingly, Walsh recommends that the best approach initially would be to approve implementation of phase-1/step-1 of the SCTA Plan, which would provide most telephone consumers in rural areas with cost savings. Once this initial step has been implemented, the Commission would have the ability to implement further end user reductions as interest surfaces in competing in rural areas.

With regard to contributions to the fund, Walsh notes that wireless carriers would contribute only in situations where they are in competition to landline services. The Legislature has provided specific criteria to make this determination. Walsh opines that these circumstances are not present in the instant case. Under Walsh's position, wireless revenues would have to be subtracted from the total retail end user telecommunications revenues used to calculate the surcharge.

Finally, Walsh states a belief that the Commission should review the size of the State USF in conjunction with the FCC's recent approval of the "CALLS" proposal. Under this scenario, the SLC would increase from $3.50 per month to $4.35 per month.
Walsh recommends that the Commission reflect the increased SLC in its calculations.

**Joseph Gillan**

Joseph Gillan, economist, testified on behalf of the Southeastern Competitive Carriers Association (SECCA) and the South Carolina Cable Television Association (SCCTA). (Tr., Vol. V, Gillan, at 1264-1309.) Gillan states that the Commission should reject the incumbent local exchange carriers' proposed final three Universal Service guidelines. Gillan alleges that SCTA's proposal would: (1) produce a massive intrastate subsidy fund, requiring a tax of approximately 35% on intrastate retail revenues to provide the subsidy level that the ILECs desire; and (2) erect an insurmountable barrier to competition, in direct contradiction of the basic purpose of the Telecommunications Act of 1996. Gillan states that the SCTA Fund is economically irrational and unsustainable. He believes that the Plan would subsidize 99.9% of the households in South Carolina, while pretending that the subsidy is collected from somewhere else.

Gillan recommends that the Commission initiate additional proceedings to consider proposals as to how to allocate fixed local network costs to determine "the cost of basic local service" as that term is used in the South Carolina statutes. Gillan also believes that there will be no impact on rural areas if the fund is not implemented immediately, since, in his opinion there is no demonstrable need to establish the fund. Gillan sees no evidence that local competition has eroded traditional support levels, since there is no explanation given for exactly what support mechanism is in jeopardy, nor where the competition that will affect it is located.

**H. Keith Oliver (Rebuttal Testimony)**

Keith Oliver filed rebuttal testimony. (Tr., Vol. V, Oliver, at 1309-1339.) Oliver expressed concern that many of the issues raised by the various intervenors would delay implementation of the State USF. Oliver opined that this will continue to leave South Carolina

citizens vulnerable to dramatic increases in basic local service rates. In Oliver's opinion, this allows others to continue to select only the most profitable services which are priced to support Universal Service and to continue to avoid responsibility to support basic local telephone service rates of South Carolina's high-cost rural customers. Further, Oliver addressed five primary issues raised by the intervenors.

Addressing the statement that the cost models are stale, Oliver notes that the models were examined during five days of detailed hearings, and that the SCTA Plan requires an update of underlying cost data at the mid-point of USF implementation. The second point Oliver addressed was the attempted reopening of old issues by the intervenors. Oliver states an opinion that these issues have been resolved. Third, the intervenors want additional information. Oliver describes the flexibility of the SCTA Plan. Fourth, intervenors state that the SCTA may "trap" the Commission into adopting a larger than necessary USF. Oliver points to the "phase-in" feature of the SCTA Plan. Lastly, Oliver states that the intervenors question who should contribute to the USF. SCTA opposes any narrowing of the contribution base.

Oliver summarizes his rebuttal by stating that SCTA's proposed Plan allows the Commission to implement the State USF now, while retaining control over the funding process.

**Peter F. Martin (Rebuttal Testimony)**

Peter Martin filed rebuttal testimony. Martin rebutted the testimony of several witnesses and emphasized that the purpose of establishing a Universal Service Fund is for the benefit of consumers; that the current system of Universal Service support cannot be sustained in a competitive environment; that a Universal Service Fund does not create "new revenues" for ILECs; and that, when all is said and done, the law requires that Universal Service be preserved.

Martin testified that the CALLS proposal only addresses the implicit support contained in interstate switched access rates, but agreed with Walsh that the increased Subscriber Line Charge should be reflected in the calculation of the size of the State USF. He rebutted Gillan's assertion that the Commission should retry the cost proceeding and allocate costs to optional vertical services and other services. He testified that the Commission should not reconsider its decision with respect to the amount of support provided to CLECs that purchase unbundled network elements, except to allow CLECs to recover expenses in addition to the actual cost of the unbundled network elements. He rebutted assertions that the State USF should not be implemented because of a lack of local competition. He testified that there is no need for a comprehensive earnings review because the effort here is about making implicit subsidy explicit.

**Emmanuel Staurulakis (Rebuttal Testimony)**

Emmanuel Staurulakis filed rebuttal testimony. Staurulakis testified that there is no need to re-examine the embedded cost models previously adopted by the Commission for use by the SCTC companies. He testified that neither federal law nor the FCC's rules require that local competition exist before a rural LEC is eligible to receive federal USF payments. Staurulakis also rebutted the testimony of other parties that it was not appropriate to include interstate revenues in the contribution base for a State USF.

**Robert McKnight (Rebuttal Testimony)**

Robert McKnight filed rebuttal testimony on behalf of BellSouth. McKnight refuted assertions by AT&T witness Guepe regarding the Universal Service cost studies previously approved by the Commission, and testified that the studies were appropriate and not outdated. McKnight further testified that the May 25, 2000 Order issued by the United States District

Court in Civil Action No. 3:97-2164-17 has no impact on this docket. He explained that the unbundled network element ("UNE") cost model that the District Court had ruled on was not used in this docket. McKnight also testified that the BCPM 3.1 model used in this docket meets all Federal Communications Commission ("FCC") requirements.

**Jerry Hendrix (Rebuttal Testimony)**

Jerry Hendrix also filed rebuttal testimony on behalf of BellSouth. Hendrix testified regarding the appropriate level of switched access rates. Specifically, Hendrix testified that switched access rates are not required to be set at TELRIC price levels.

**James A. Appleby (Surrebuttal Testimony)**

James Appleby filed surrebuttal testimony. Appleby disagreed with witnesses Walsh and Martin that the increased Subscriber Line Charge resulting from the CALLS proposal should be taken into account in calculating the size of the State USF. According to Appleby, the CALLS plan is a comprehensive restructuring of the interstate access rates, and to reflect only part of this comprehensive interstate restructuring plan in the intrastate USF support calculation without the other corresponding changes is inappropriate.

**Richard Guepe (Surrebuttal Testimony)**

Richard Guepe filed surrebuttal testimony, in which he responded to rebuttal testimony filed by several witnesses on behalf of the SCTA and the SCTC.

## III. UNIVERSAL SERVICE POLICY AND HISTORY

The goal of Universal Service is to ensure the widespread availability of affordable local exchange telephone service. Universal Service has long been a public policy, both at the state and federal level, and was further defined and codified in the federal Telecommunications Act of

1996 ("the 1996 Act"). In its 1996 Act, Congress sought to encourage competition in the telecommunications industry while still ensuring that Universal Service would be preserved and advanced for consumers in all areas of the country. Congress envisioned that Universal Service was the joint responsibility of both state and federal jurisdictions.

Prior to the divestiture of AT&T in 1984, a complex method of support for Universal Service existed. The costs of providing basic local exchange service were recovered through implicit support from a local exchange carrier's (LEC) rates for other services, as well as AT&T's rates for interstate long distance service. In the 1980's, when the long distance market was becoming more competitive, the FCC developed and implemented the concept of access charges. Access charges provided a general mechanism through which all long distance carriers could pay the LECs for the costs of handling long distance as well as continue to provide support for Universal Service.

Access charges did not replace the implicit support provided through the LECs' rates for other services. LECs continue to provide a substantial portion of support through the rates they charge for long distance toll, business services, intrastate access charges, and other services. The current support system of using "implicit" subsidies for basic local service has evolved over a long period of time as a result of many individual regulatory decisions in rate cases and other proceedings. LECs were granted exclusive franchises to serve particular local exchange areas. In return, the LECs assumed an obligation to serve all customers within that area, no matter how remote the customer was or how sparsely populated the area. These high cost areas were often expensive to serve. LECs were prohibited, however, from pricing services to high cost areas differently from the lower cost areas. Keeping in mind the social policy that rates for basic local

service should remain affordable for all consumers, rate increases in business or long distance services have been favored over increases in basic residential rates whenever possible to keep local residential rates affordable for all South Carolina residents.

In the 1996 Act, Congress opened up local exchange telephone markets to competition. In doing so, Congress recognized that the implicit cross-subsidies that have traditionally supported Universal Service could not be maintained in a competitive marketplace. Competitors would naturally target those customers who are charged above-cost rates or who provide a greater than average amount of revenues, and would undercut those rates, since such competitors have no obligation to serve an entire service area. The incumbent local exchange carrier (ILEC) would lose the source of funding that supports Universal Service, and local rates would have to rise substantially to reflect the actual costs of providing service in the fully competitive environment.

Congress recognized that it would have to put mechanisms in place to preserve Universal Service in a competitive environment. In the Act, Congress directed the FCC and the states to develop mechanisms to ensure that consumers in all regions have access to telecommunications and information services. Recognizing that the costs of providing telecommunications services in high cost areas could be a barrier to subscribership, Congress wished to ensure that consumers in these areas had access to services at rates which were reasonably comparable to rates charged for similar services in lower cost areas. See 1996 Act § 254(b)(3).

At the State level, S.C. Code Ann. § 58-9-280(E) requires that the Commission establish a USF to continue South Carolina's commitment to universally available basic local exchange telephone service at affordable rates and to replace implicit subsidies with explicit support.

Section 254(f) of the 1996 Act provides that states are free to adopt their own Universal Service funding mechanisms, as long as definitions and standards do not rely on or burden federal Universal Service support mechanisms.

Summary of FCC Actions on Universal Service

The FCC has conducted a number of proceedings on Universal Service since enactment of the 1996 Act. A Federal State Joint Board on Universal Service ("Joint Board") was established to make recommendations to the FCC for changes in the federal mechanisms.

In its Second Recommended Decision,[1] the Joint Board recommended that each jurisdiction should have primary responsibility for addressing the support provided by its own rates for services providing implicit support. The Joint Board also found that the implicit subsidy flow generated by intrastate rates is primarily a state responsibility, and that the *state commissions should take the lead in addressing these subsidies* (emphasis added).

The Joint Board recommended that the FCC play a limited role in solving state Universal Service problems, and proposed that the calculation for high cost support previously adopted by the FCC, with its 75%/25% division of high cost support, be abandoned. Instead, the FCC should simply compare the average cost of service in a study area—as measured by a cost model—with the nationwide average cost of service. If the average cost in a study area exceeded the nationwide average by more than a certain benchmark percentage, then the federal fund would make up the difference.

After consideration of the Joint Board's most recent recommendations, the FCC reconsidered many of its earlier decisions. In an Order released on May 28, 1999, the FCC

[1] Federal-State Joint Board, Second Recommended Decision, *In the Matter of Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Released 11/26/98.

adopted most of the recommendations of the Joint Board. The FCC changed its focus from sharing the Universal Service high cost burden with individual states to addressing only the issue of comparability among the states. See FCC's Ninth Report and Order and 18th Order on Reconsideration, CC Docket 96-45 (released 11/2/99) at para. 7. It adopted a methodology for determining non-rural carriers' high cost support amounts using a single, national cost model and a national cost benchmark of 135 percent above the nationwide average cost. While the FCC rejected the use of individual state cost studies for the purpose of developing its method for rate comparability, it stated that the states retain the flexibility to design state-level support mechanisms using other indicators of cost. The FCC also rejected its prior proposal to utilize a revenue-based benchmark. The FCC released an Order on November 2, 1999, which implemented the High Cost USF for non-rural carriers effective January 1, 2000.

Although South Carolina's costs were above the national average, they did not reach the 135% threshold established by the FCC for additional high cost support. Thus, South Carolina will receive limited funding from the new federal high cost USF. While only eight states will qualify for new federal USF funding under the FCC's high cost funding mechanism, the FCC did adopt a "hold harmless" transition plan for up to three years for non-rural carriers currently receiving funding from the interstate high cost fund. Thus, South Carolina non-rural carriers may continue to receive approximately $4.9 million a year (for the next three years) that has been used to help keep intrastate rates affordable.

The FCC has also undertaken significant action to address that portion of the implicit support that is contained in interstate access charges. The FCC issued an Order on May 31, 2000 adopting a proposal put forth by the Coalition for Affordable Local and Long Distance Service

("CALLS"). The proposal contains several key components aimed at greatly reducing the implicit support for Universal Service currently built into the interstate access rate structure. The proposal (1) gradually raises residential subscriber line charges while reducing/eliminating many of the charges billed to the interexchange carriers; (2) calls for the explicit recovery of Universal Service Fund contributions from end users; and (3) institutes a $650 million Universal Service Fund that will target support to the areas that most need it. The CALLS plan became effective on July 1, 2000.

While the CALLS proposal will help remove some of the implicit support in interstate access rates, it is strictly an interstate mechanism and does not in any way address the 75 percent of costs still assigned to the state jurisdiction.

Summary of South Carolina Public Service Commission Actions on Universal Service

The instant proceeding is the Commission' s third proceeding to address State USF. In the first proceeding in Docket No. 97-239-C, which began in August 1997, the Commission adopted guidelines, as required by S.C. Code Ann. § 58-9-280(E). The guidelines, among other things, define the services that are supportable under the State USF, define eligibility requirements for receiving funding from the State USF, declare that funding is portable to any qualified Carrier of Last Resort, and establish the administrator of the State USF. The Commission deferred issues relating to the selection of an appropriate cost model(s) and methodologies, sizing the fund, recovery of USF contributions, and maximum allowable rates.

With respect to sizing the fund, the State statute provides that the size of the State USF is the sum of the difference, for each carrier of last resort, between its costs of providing basic local exchange services and the maximum amount it may charge for the services. S.C. Code Ann. §

58-9-280(E)(4). At the time of the first proceeding, however, the Commission had not yet determined the appropriate methodology to be used to determine costs and thus was unable to size the fund at that time.

In its second proceeding in November 1997, the Commission primarily addressed the selection of appropriate cost model(s) and methodologies, and sizing the State USF. The Commission adopted the Benchmark Cost Proxy Model 3.1 as the state forward-looking cost model for BellSouth, GTE, and Sprint/United, after making certain modifications to company specific inputs. The Commission also adopted the South Carolina Telephone Coalition's proposed embedded cost model, including recommended inputs for rural LECs (other than Sprint/United). All other matters related to the intrastate USF that were not ruled upon were "held in abeyance."

## IV. DISCUSSION

Our Order No. 2000-0177 set out several issues to investigate in this portion of our on-going Universal Service Fund proceeding, including the proposal put forth in SCTA's proposed plan for implementation of the State USF. The testimony in this latest phase of this Docket runs the gamut from those actively seeking implementation of the fund, to those adamantly opposed to its implementation, and many positions in between. We have considered all of the testimony presented in the case, including all of the rebuttal and surrebuttal testimony, and we make the following findings and conclusions.

## V. FINDINGS AND CONCLUSIONS

1. The South Carolina General Assembly has directed the Commission to establish a State USF for distribution to carriers of last resort. S.C. Code Ann. § 58-9-280(E).

2. The United States Congress has directed that "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5)

3. Implementation of the State USF is necessary to remove implicit support from rates and make the funding explicit. This will ensure the continuation of Universal Service -- i.e. the provision of basic local exchange telephone service at affordable rates, upon reasonable request – to all residential and single-line business customers in South Carolina. (Tr. Vol. II at 264-65; Vol. III at 675-77).

4. The current system of implicit support for basic local telephone service built into rates for other services cannot be sustained in a competitive environment. Erosion of the implicit support due to natural competitive forces will adversely impact the availability of affordable basic local telephone service to all South Carolina citizens. (Tr. Vol. II at 264-65; Vol. III at 676-77; Hearing Exhibit 18). As stated by Commission Staff witness Gary Walsh, the primary goals of the Telecommunications Act of 1996 were to provide for competition in existing monopoly local telecommunications markets, and to maintain Universal Service concepts to support the continuation of affordable local rates. (Tr. Vol. IV at 1123). We agree with Walsh' s assertion that enhancing competition and maintaining affordable local rates in high-cost areas are conflicting goals. As competition lowers the prices for telecommunications services that have been priced above cost, the subsidies provided by the services to support affordable local rates in high-cost areas decline. To the extent that the goal of enhancing competition is achieved, it has an adverse impact on attaining the goal of maintaining affordable local rates in high-cost areas. (Tr. Vol. IV at 1124.)

5. All telecommunications carriers shall contribute to the support of universal service in South Carolina. 47 U.S.C. § 254(f); § 254(b)(4); S.C. Code Ann. § 58-9-280(E)(2). The current system of implicit support benefits competitive local exchange carriers because they do not have an obligation to provide basic local service to all requesting customers, and they currently are not required to contribute to Universal Service, which gives them a competitive advantage over ILECs. (Tr. Vol. II at 264-65, 299; Vol. III at 675; Vol. V at 1313).

6. The Commission has already approved many of the guidelines necessary for implementation of the State USF, and has adopted cost studies and methodologies, consistent with state and federal law, for calculating the incumbent local exchange carriers' cost of providing basic local exchange telephone service in South Carolina. See Commission Order Nos. 97-753, 97-942, 98-201, and 98-322 in this docket.

7. We agree with Mr. Walsh's recommendation regarding the reduction of access charges by 50% and recovery of that amount from the State USF, and find that this access reduction should be effective as of October 1, 2001. This initial step would result in approximately $38.4 million in access reductions, which represents approximately $36 million testified to by the SCTA companies and $2.4 million testified to by Sprint. We note that ALLTEL has put forth no testimony with respect to the impact of any proposed access reductions, and find that ALLTEL must make a showing to this Commission of the amount required from the State USF before being permitted to participate in the State USF.

8. As testified to by Mr. Walsh, the 50% access rate reduction will bring South Carolina's intrastate access charges more in line with other states in the southeast region, and should result in considerable savings to South Carolina consumers. (Tr. Vol. IV at 1123).

Intrastate switched access rates are priced above cost and contain significant implicit support for basic local exchange telephone service. Access service is particularly susceptible to bypass and competitive erosion. (Tr. Vol. IV at 771-72, 1132, 1133). A 3-cent combined rate for intrastate switched access is appropriate and above cost. (Tr. Vol. II at 358; Vol. III at 669; Vol. IV at 807-08, 822-24, 1004; Hearing Exhibit 16). It is well above the targeted CALLS rate for interstate switched access rates for price cap LECs. (Tr. Vol. II at 358). In addition, South Carolina legislative policy favors comparability of intrastate switched access rates among ILECs. (S.C. Code Ann. § 58-9-280(L)).

9. The FCC has taken action through the CALLS Order to reduce interstate access charges to 1.1 cents per minute. (Tr. Vol. II at 358). Clearly, the almost 2-cent differential between the ordered interstate access charges and the ordered intrastate access charge of 3 cents reflects an implicit subsidization of basic local telephone service. Therefore, any linkage between access charges and cost data from the BCPM 3.1 model and the embedded cost models, submitted as evidence in this hearing, is discounted. Additionally, in initially adopting the Staff recommendation to reduce access charges, and requiring further detailed cost data before any local exchange carrier can receive further funding, it is the opinion of this Commission that there will be further cost data provided in subsequent hearings, and the cost data already submitted in no way biases or discounts this Commission' s decision regarding rate reductions under the State USF.

10. In order to ensure that consumers will see the benefit of reduced access charges, we hereby order interexchange carriers to flow through their savings from lower access rates to their customers in the form of lower long distance rates.

11. We also adopt Staff's recommendation to include maximum state funding for Lifeline and Linkup services for low income consumers in the first phase of implementation of the State USF, as previously directed in Commission Order No. 97-516, dated June 13, 1997. State funding in the amount of $3.50 per month for each qualifying low-income customer will enable the providers of Lifeline assistance to be eligible for additional federal matching funds for Lifeline services. However, because BellSouth is currently funding the state portion of Lifeline, we will require BellSouth to submit to the Commission proposed rate reductions equal to the amount of the current funding for BellSouth's Lifeline customers. This will ensure that implementation of the State USF does not create a windfall for BellSouth. (Tr. Vol. III at 687).

12. In order to receive funding beyond the initial step, any local exchange carrier applying for further reductions under the State USF must file detailed cost data with the Commission clearly demonstrating that implicit support exists in the rates that are proposed to be reduced.

13. In addition to our adoption of the recommendations outlined above, we adopt those parts of the SCTA's proposal, including modifications to the State USF guidelines, that are not inconsistent with the specific recommendations outlined and adopted above. Staff is instructed to modify the Administrative Procedures proposed by the SCTA to the extent necessary to be consistent with the recommendations we are adopting, including the October 1, 2001 start date for access reductions and tariff filings for the second step of the first phase (i.e., the timeframes stated in the Administrative Procedures should be shifted by 6 months).

14. A phase-in approach to implementing State USF will allow the Commission to break down implementation into a manageable process, allowing for a closer observation of its

impact on consumers. A phase-in should ensure the Commission adequate oversight over the USF implementation process, enabling the Commission to properly match withdrawal from the State USF with the rate reductions of each local exchange carrier. (Tr. Vol. III at 428). Our requirement that local exchange carriers file detailed cost data clearly demonstrating that implicit support exists in the proposed reduction before being permitted to receive funding beyond the initial access step will also enable the Commission to effectively and efficiently manage the implementation of the State USF.

15. We adopt the recommendation made by Staff and Verizon Wireless that we exclude wireless revenues from the base of contributions for the State USF at this time. State law provides that "the Commission shall require all telecommunications companies providing telecommunications services within South Carolina to contribute to the USF as determined by the Commission." S.C. Code Ann. § 58-9-280(E)(2). The term telecommunications services is defined to include "nonwireline services provided in competition to landline services." S.C. Code Ann. § 58-9-10(15). Further, the State Act provides that the Commission "shall require any company providing telecommunications service to contribute to the USF if, *after notice and opportunity for a hearing*, the Commission determines that the company is providing private local exchange services or radio-based local exchange services in this State that compete with a local telecommunications service provided in this State." S.C. Code Ann. § 58-9-280(E)(3) (emphasis added). As pointed out by Mr. Walsh, there has not been sufficient evidence presented in this proceeding that any wireless communications service provider competes with any local exchange service provider in South Carolina. (Tr. Vol. IV at 1128). We therefore, in effect, are granting Verizon's Motion for a Directed Verdict as to the wireless portion of this

case. However, while the record before us is not sufficient to make a finding otherwise, we reserve the right to revisit this issue. Furthermore, we find that, if a wireless carrier applies to this Commission for carrier of last resort or eligible telecommunications carrier status, such application would be considered a declaration of that carrier's intent to offer services that compete with local telecommunications services being provided in the State, and that carrier will be required, upon approval of the request for carrier of last resort or eligible telecommunications carrier status, to contribute to the State USF.

16. Staff also recommended that this Commission consider any court decisions addressing the revenue issue prior to making a final decision on the correct revenue component to use in assessing contributors to the State USF. (Tr. Vol. IV at 1126). We agree with Staff's recommendation, and we have reviewed the relevant law. We find no legal basis to change our earlier determination that all telecommunications carriers offering services within the state shall contribute to the USF on the basis of their relative shares of all (i.e., interstate and intrastate) retail end user revenues generated by and/or billed to an end user in the State of South Carolina. (See Commission Order No. 97-753, dated September 3, 1997, at 15-16). The decision of the 5th Circuit Court of Appeals in Texas Office of Public Utility Counsel v. Federal Communications Commission, 183 F.3d 393 (5th Cir. 1999) is not controlling and does not require us to revisit our earlier determination. The 5th Circuit Court of Appeals found only that the *FCC* did not have jurisdiction to include *intrastate* revenues in the base for calculating federal USF contributions. This does not mean that the converse is true. We believe it is reasonable for this Commission to include interstate revenues in the base of revenues on which State USF contributions are calculated, because such revenues are billed to end users *in the State of South Carolina*. (Tr. Vol.

V at 1334-35; see 1996 Act Section 254(f) (carriers will contribute to the State USF on an equitable and nondiscriminatory basis "*in a manner determined by the State.*")) Further, inclusion of such revenues does not rely on or burden federal Universal Service support mechanisms. See 1996 Act Section 254(f). This is particularly true in light of the FCC's reliance on the states to shoulder the majority of the burden for ensuring the continued provision of Universal Service within their states. In its May 28, 1999, Order on Universal Service, the FCC changed its focus from sharing the Universal Service burden with individual states to addressing only the issue of comparability among the states. See FCC's Ninth Report and Order and 18th Order on Reconsideration, CC Docket 96-45 (released 11/2/99) at para. 7. Both intrastate and interstate telecommunications services sold in South Carolina will benefit from Universal Service and should share in contributing to the State USF.

17. We agree with AT&T's assertion that the Interim LEC Fund should become part of the State USF. S.C. Code Ann. § 58-9-280(M) provides that the Interim LEC Fund will transition into the State USF "when funding for the USF is finalized and adequate to support the obligations of the Interim LEC Fund." Because the State USF is neither finalized nor adequate to support the obligations of the Interim LEC Fund, we decline to require a transition of the Interim LEC Fund into the State USF at this time. However, in order to help with the transition of the Interim LEC Fund into the State USF, we hold that if the largest LEC operating in the State reduces access and recovers that amount from the State USF, any ILEC mirroring that access reduction would be required to do so through the State USF mechanism and not through the Interim LEC Fund mechanism.

18. We agree with the position of the SCPCA that payphone service providers should not be required to contribute twice to the State USF. (Tr. Vol. IV at 1022). This is consistent with our earlier ruling in this docket. Commission Order No. 97-753 at 17. Section 5 of the guidelines is hereby modified to include the following language: "Payphone service providers shall contribute to the State USF based on end user revenues, and not the payphone service providers' local telephone service bills."

19. We also adopt the recommendation of several parties, including the Commission Staff and Sprint, that companies should be authorized to recover contributions to the fund through the use of a uniform percentage surcharge on end user retail revenues. We find that an explicit uniform percentage surcharge is an efficient, fair and competitively neutral method to collect universal service funding. (Tr. Vol. III at 656-58). Such a surcharge also meets the 1996 Act's requirement to make Universal Service support explicit. (Tr. Vol. III at 656-57). The surcharge will be updated at least annually, consistent with the Administrative Procedures proposed by the SCTA. Updates are necessary because the fund size is likely to change as a result of changes to end user prices, the number and distribution of customers, the number of providers, and the amount of total retail telecommunications revenue. (Tr. Vol. III at 657). We note that the surcharge for the first step of State USF implementation is a small percentage of the customer's total telecommunications bill. Commission Staff witness Walsh estimated that the percentage surcharge for the initial access step would be approximately 1.3%, or an increase of approximately 23 cents per month for the average residential customer. (Tr. Vol. V at 1215). Further, we note that carriers of last resort are required to make dollar-for-dollar reductions in rates for services that currently contain implicit support before they can withdraw from the State

USF. Thus, many customers will likely see an overall reduction in their bill for telecommunications services, even with the surcharge. While we recognize that there will be some customers who will see a small increase in their bills (i.e., those who predominantly use basic local exchange service and have a limited amount of toll calling and vertical services), we believe that a small increase in the total amount paid by some for telecommunications service is necessary to preserve and advance Universal Service for all. Otherwise, the full amount of implicit support will be competed away (Tr. Vol. II at 320), and local rates would have to be priced at cost. (Tr. Vol. III at 468; 472).

20. Mechanisms that are currently in place (e.g., the Interim LEC Fund) do not adequately address Universal Service objectives. The Interim LEC Fund covers only certain access reductions, and is available only to ILECs other than BellSouth. The State USF would be portable and available to all carriers who undertake the carrier of last resort obligation, including competitive local exchange carriers. It would also be available to fund the reduction of implicit support in rates other than intrastate switched access, including but not limited to intraLATA toll rates, local area calling plans, private line services, foreign exchange services, certain business line rates, and vertical services including class and custom calling features. (Tr. Vol. III at 435).

21. Several parties have requested that we start anew in addressing cost studies for the local exchange carriers, and require the new cost studies to reflect allocation of joint and common costs to all services that use the network. The Commission has previously approved a cost methodology and cost models including embedded cost models for rural LECs. See Commission Order No. 98-322 in this docket. There is no need to revisit this issue. The Commission held lengthy hearings to address cost models and methodologies in this docket,

hearing evidence through 5 days of hearings spanning a time period of almost 4 months, from November 1997 until March 1998. The evidence included the testimony of 25 witnesses, including economic, financial, engineering, and cost experts, among others. After reviewing all of the evidence presented, the Commission adopted BCPM 3.1 as the state forward-looking cost model for BellSouth, GTE, and Sprint/United. In doing so, the Commission made specific findings regarding the BCPM 3.1 and this model's ability to design an appropriate network and to accurately locate customers in rural and high cost areas. The Commission examined in detail the proposed inputs and ordered several modifications. With respect to rural companies, the Commission adopted the South Carolina Telephone Coalition's proposed embedded cost model, including recommended inputs, for rural LECs other than Sprint/United in South Carolina. All models and inputs proposed by the various parties were subject to detailed cross-examination and rebuttal by all parties. It would be highly inappropriate and inefficient to disregard these prior proceedings and the resulting findings and conclusions. Furthermore, even if we were to address cost models and methodologies anew, we do not believe it would be appropriate to allocate the costs of the network to services other than basic local service. Basic local service is the "cost causer" of loop costs. (Tr. Vol. II at 357-58). The Consumer Advocate's witness states that a portion of the joint and common loop costs should be allocated to access. (Tr. Vol. IV at 862-63). Yet access currently provides significant support for basic local exchange service. In other words, it is one of the services whose rates are subject to downward competitive pressure and whose implicit support the State USF is intended to replace with explicit support. Any mechanism that relied on support from these services would be neither "predictable" nor "sufficient," and would violate Section 254(f) of the 1996 Act. The same arguments regarding

allocation of costs were made to the FCC and rejected. (Tr. Vol. II at 357-58). We likewise reject them here.

22. Several parties have also argued that the previously approved cost studies should be updated. We decline to further delay the implementation of a State USF by requiring the cost studies to be updated at this time. These cost studies provided a cost of service per access line for each designated Universal Service support area. Because these studies are based on broad forward-looking models, or in the case of the rural LECs, embedded cost, it is reasonable to assume that the resulting cost per line will not change significantly over a relatively short time frame of four to five years. We believe it is reasonable, however, to require that results from these models be updated by each LEC before that LEC's State USF withdrawal exceeds one-third of its company-specific State USF amount. This will ensure that no company's withdrawal exceeds appropriate cost or the allowable State USF for that specific company.

23. We previously adopted guidelines requiring that the State USF be revenue neutral for ILECs. Because each ILEC must make dollar-for-dollar reductions in rates containing implicit support before the ILEC can withdraw explicit support from the State USF, we find that the State USF will have no impact on earnings of the companies and, thus, it is not necessary to conduct earnings reviews prior to implementing the State USF. The Commission has separate mechanisms in place to exercise regulatory oversight with respect to the operations and earnings of the companies it regulates, and will continue to utilize those methods. We note, also, that there is no earnings review requirement before a company can receive Federal Universal service funding. We likewise reject the argument that the State USF will provide ILECs with a guaranteed level of earnings – in effect, some kind of "insurance" against competitive loss. State

USF funding is portable and, as such, can be competed away just like other sources of customer revenue. (Tr. Vol. II at 297).

24. The guidelines previously adopted by the Commission, consistent with state law, permit carriers of last resort to receive funding for each individual single-party residential or single-line business line regardless of its classification as a primary or non-primary line. See Section 6 of the guidelines. We decline to reconsider this issue, as some parties have suggested. First, the issue was ruled upon in Commission Order No. 97-753 in this docket. Further, this issued was raised in a petition for reconsideration of our earlier order [see AT&T Petition for Reconsideration and/or Rehearing of Order No. 97-753 at para. 2, pp. 2-3] and reconsideration was denied. We do not believe it is appropriate or efficient to keep reopening and addressing the same issues in this docket. Second, a requirement that only primary lines be eligible for State USF funding would be difficult to administer. (Tr. Vol. III at 594). Where two lines are present in the home, it would be extremely difficult for the company to determine which is the primary and which is the secondary line. Add another carrier to the equation (e.g. one line provided by the ILEC and one by the CLEC) and the confusion escalates. It is important to keep in mind that primary and secondary lines are not separately tariffed. The second line is still being provided at a tariffed rate that is below cost. ((Tr. Vol. II at 362). If secondary lines were not eligible for State USF, carriers should not be required to provide those lines below their cost. Secondary lines would be separately tariffed, in many cases at a much higher rate than the current basic local service rate. In rural areas, this could mean the difference between a customer having or not having a second line (internet access, etc.) (Tr. Vol. III at 594). The FCC does not make a

distinction between primary and secondary lines for purposes of Universal Service funding at the federal level. See 47 C.F.R. Part 54. We likewise decline to do so.

25. For the same reasons, we reject other requests to reconsider portions of the guidelines we have already considered, including AT&T's argument that we should reconsider the amount of support that a competitive provider may receive when it provides service by purchasing unbundled network elements from the ILEC. We do, however, agree with witness Guepe that CLECs have expenses in addition to the cost of the UNEs themselves, and that CLECs should be permitted to recover those costs. (Tr. Vol. IV at 929-30). The guidelines we have previously adopted do not specifically reference this. We agree with witness Martin's testimony (See Peter F. Martin Rebuttal Testimony, stipulated into the record by the parties) that a realistic surrogate for the expenses incurred by a CLEC is the percentage deducted for "avoided costs" from the resale price for CLECs by an ILEC, and we modify the guidelines accordingly.

26. We find that the State USF will benefit rural areas by preserving and advancing universal service. If we did not put in place a mechanism to ensure the continued provision of affordable basic local exchange telephone service to all citizens, customers in rural areas would be most impacted. Without a Universal Service Fund mechanism, competition would drive prices to cost, and costs are generally higher for rural customers than for urban customers. (Tr. Vol. III at 472). The State USF will also benefit customers in rural areas by providing an incentive for competing carriers to provide service in those areas. (Tr. Vol. III at 572-73; Vol. IV at 1046).

27. We do not believe it is appropriate, as some parties have suggested, to require a showing of competition or competitive loss before permitting a carrier of last resort to participate in the State USF. There is no such requirement contained in the State USF statute. Additionally, there is no competitive loss requirement contained in federal law or in any of the FCC's orders on Universal Service. (See also Tr. Vol. II at 351-52; Vol. III at 678, 679; Vol. IV at 822). To the contrary, both state and federal law contemplate that the opening of local exchange markets to competition and the establishment of mechanisms to preserve and advance universal service will proceed on parallel tracks. (See 1996 Act § 254; S.C. Code Ann. § 58-9-280(E)).

28. The FCC's Order on the CALLS proposal does not affect our decision, except with respect to its effect on the Subscriber Line Charge (SLC) and consequent sizing of the State USF. While the CALLS proposal will help remove some of the implicit support in interstate access rates, it is strictly an interstate mechanism and does not in any way address the 75 percent of costs still assigned to the state jurisdiction. (Tr. Vol. II at 276-77). However, we agree with Commission Staff witness Walsh's testimony that the increase in the SLC for non-rural carriers as a result of the FCC's CALLS Order should be reflected in the Commission's calculations in sizing the State USF. (Tr. Vol. IV at 1128-29). Any increase in the effective SLC would constitute an increase in the maximum amount a carrier of last resort may charge for its basic local exchange services and, by the application of S.C. Code Ann. § 58-9-280(E)(4), would reduce the size of the fund accordingly.

29. We previously stated that we would consider the impact of the Orders issued on May 25, 2000, and August 14, 2000, by the United States District Court in AT&T v. BellSouth et al., Civil Action No. 3:97-2164-17, on our determination in this docket. We conclude that these

orders have no impact on our decision in this docket. In its May 25 Order, the District Court ruled, among other things, that BellSouth's UNE rates did not comply with the FCC's TELRIC pricing rules. On July 18, 2000, however, the FCC's TELRIC pricing rules were vacated by the Eighth Circuit Court of Appeals. Iowa Utilities Bd. v. FCC, 219 F.3d 744 (8th Cir. 2000) ("Iowa Utilities II"). In light of Iowa Utilities II, the District Court issued a second order nullifying in large part the Court's prior order. Specifically, the District Court found that the Commission-approved UNE cost model is not inconsistent with the Telecommunications Act. (August 14 Order, at p. 7). Because the District Court had questions about certain inputs used in the UNE cost model, however, it remanded the case to the Commission for the Commission to determine if and to what extent BellSouth uses integrated digital loop carrier ("IDLC") technology in its network and to what extent the Commission included historical costs in the Commission-approved UNE cost model. (August 14 Order, at pp. 8-10). In contrast, and as demonstrated by the uncontroverted testimony of McKnight, the model used in this docket -- BCPM -- is a forward-looking model that assumes 100% use of IDLC technology and meets all applicable FCC requirements. (Prefiled Rebuttal Testimony of Robert McKnight at p. 5, stipulated into the record at Vol. V, p. 1341). Therefore, the rulings issued by the District Court concerning the UNE cost model are not relevant here and have no impact on this docket.

30. We deny the SCPCA's motion for a directed verdict on the issue of whether BellSouth's Public Telephone Access Service (PTAS) rates should be reduced by the amount of the federal Subscriber Line Charge. This proceeding deals with State USF and it is inappropriate to reduce a particular company's PTAS rate in this proceeding. Moreover, the orders issued by this Commission in Docket No. 97-124-C plainly establish that all implicit subsidies have been

removed from BellSouth's PTAS rate. This proceeding deals with the removal of implicit support in favor of an explicit support mechanism. The Subscriber Line Charge is already an explicit cost recovery mechanism and should not be eliminated here. Obviously, the purpose of the present proceeding was not to consider PTAS rates, but whether or not we should implement some version of a State Universal Service Fund. SCPCA's assertions would best be considered in another forum, where we are able to focus on SCPCA's specific concerns.

This Order shall remain in full force and effect until further Order of the Commission.

BY ORDER OF THE COMMISSION:

Chairman

ATTEST:

Executive Director

(SEAL)

# EXHIBIT B

BEFORE

THE PUBLIC SERVICE COMMISSION OF

SOUTH CAROLINA

DOCKET NO. 97-239-C - ORDER NO. 2001-704

AUGUST 31, 2001

| | | |
|---|---|---|
| IN RE: Proceeding to Establish Guidelines for an Intrastate Universal Service Fund. | ) ) ) | ORDER ON RECONSIDERATION |

This matter comes before the Public Service Commission of South Carolina (the Commission) on various Petitions for Clarification/Rehearing/Reconsideration of Order No. 2001-419 filed on behalf of BellSouth Telecommunications, Inc. (BellSouth), the South Carolina Public Communications Association (SCPCA), the Consumer Advocate for the State of South Carolina (the Consumer Advocate), the Southeastern Competitive Carriers Association (SECCA), MCI WorldCom (WorldCom), the South Carolina Cable Television Association (SCCTA), and AT&T Communications of the Southern States, Inc. (AT&T). In addition, Returns were filed on behalf of the South Carolina Telephone Association (SCTA), and Verizon South, Inc. (Verizon). We will address each Petition individually.

**BELLSOUTH PETITION**

BellSouth has requested a clarification and/or reconsideration of the language contained in paragraph 11 of Order No. 2001-419. BellSouth asks that the language be revised to clarify that the Commission is adopting BellSouth's proposal, as contained in the testimony of Peter F. Martin, to make rate reductions equal to the amount of the current funding for BellSouth's Lifeline customers. Specifically, BellSouth proposes that

CC ORIGINALS TO:
HL✓ GC✓
Date Rec'd 9/5/01
Haynsworth Sinkler Boyd, PA

we delete the last two sentences of paragraph 11 of the Order and replace them with the following language:

> BellSouth is currently funding the state portion of Lifeline. In order to ensure that the implementation of the State USF does not create a windfall for the company, BellSouth has stated that it will submit to the Commission rate reductions equal to the amount of the current funding for BellSouth's Lifeline customers. See Testimony of Peter F. Martin. (Tr. Vol. III at 687). We adopt BellSouth's proposal.

SCTA supports BellSouth's requested clarification. We grant the clarification and/or reconsideration as filed. Clearly, BellSouth proposed the Lifeline equivalent rate reductions in its testimony, and we see no problem with modifying the language in paragraph 11 of Order No. 2001-419 as requested. Therefore, the last two sentences in paragraph 11 of our Order No. 2001-419 are hereby deleted, and the language as stated above shall replace those sentences.

## SCPCA PETITION

SCPCA has filed two petitions in one: a Petition for Clarification and a Petition for Reconsideration. We grant clarification, but deny reconsideration.

First, in its clarification request, SCPCA requests that we further explicate our holding in Order No. 2001-419 that payphone service providers should not be required to contribute twice to the State Universal Service Fund (USF). SCPCA further notes that its proposed amendment to Section 5 of the Guidelines in this matter is clear and unopposed, in that revenues earned by local exchange carriers (LECs) and interexchange carriers (IXCs) from local and long distance charges to payphone service providers (PSPs) are not retail end user telecommunications revenues subject to USF charges. Specifically, SCPCA proposes the following amendment to Section 5 of the USF Guidelines:

> Charges by local or long distance telecommunications carriers to Payphone Service Providers (PSPs) for toll or access line charges are not retail "end user" telecommunications revenues, and do not serve as a basis for that local or long distance telecommunications carrier's contributions to the USF. As such, local and long distance telecommunications carriers are prohibited from passing any USF charges on to their PSP customers.

Although we do not necessarily agree that this language is "essential" in order to ensure that PSPs will not pay twice into the USF, we do agree that the language may be helpful in effectuating the Commission's intent to prevent such double payment from occurring, and we hereby adopt the modification to Section 5 of the Guidelines as proposed above by SCPCA.

However, we deny SCPCA's Petition for Reconsideration, which would modify the adoption of the phase one, step one plan in Order No. 2001-419. SCPCA has proposed adding to this phase a $10.88 rate reduction to BellSouth's current rate for payphone access line service (PTAS). SCPCA considers this PTAS rate an implicit subsidy that should be removed along with the reduction to switched access. SCPCA proposes that BellSouth withdraw the resulting decrease in revenues from the USF, so that the "PTAS rate reduction will be revenue-neutral for BellSouth."

As we stated in Paragraph 30 of Order No. 2001-419, it is inappropriate to reduce a PTAS rate in this Universal Service Fund proceeding. As we further noted in that Order, SCPCA's assertions would best be considered in another forum, where we are able to focus on SCPCA's specific concerns. We intend to establish that forum herein.

This Commission is very concerned over the future of the payphone industry in South Carolina, especially with the scheduled departure of BellSouth Public

Communications from the payphone business on or about December 31, 2002. Accordingly, we hereby establish a generic docket to consider the potential recovery of the Subscriber Line Charge (SLC) and the Primary Interexchange Carrier Charge (PICC) through the State Universal Service Fund. In addition, this generic docket will include the exploration of the concept of public interest payphones and the provisioning of these phones to low income areas. We believe that SCPCA's concerns and this Commission's concerns may be addressed in this generic docket.

In any event, we deny SCPCA's Petition for Reconsideration, but we establish the generic docket as outlined above.

**CONSUMER ADVOCATE PETITION**

The Consumer Advocate proffers a number of grounds in his Petition for Reconsideration. First, the Consumer Advocate asserts that the decision to determine the size of the USF, or to institute funding in any amount is arbitrary, capricious, contrary to the evidence of record, and in violation of other provisions of South Carolina law. This comes as somewhat of a surprise to us, considering the General Assembly's 1996 mandate to this Commission to establish a State Universal Service Fund. This is contained in S.C. Code Ann. Section 58-9-280 (E)(1)-(8)(Supp. 2000). (Subsection (E)(4) specifically states that "the size of the USF shall be determined by the Commission…") This Commission has held exhaustive proceedings over the last five years to address guidelines for administration of the State USF, cost models, and methodologies. Apparently, the Consumer Advocate would have us ignore all of our prior proceedings and the mandate of the General Assembly to implement a State Universal Service Fund.

The Consumer Advocate specifically asserts that this Commission erred in sizing the State USF because we approved a cost methodology that did not isolate the costs of providing only basic local exchange service. We would note that the determination of appropriate methodologies for calculating the cost of basic local service was made by this Commission in Order No. 98-322 in this Docket. This Order was issued on May 6, 1998, and no appeal was taken by the Consumer Advocate. Thus, the law of the case on costing has been established, and the Consumer Advocate may not now challenge our findings in that Order.

Further, even if the Consumer Advocate had properly preserved his argument, our determination regarding cost methodologies was reached after consideration of 5 days of evidence that included the testimony of 25 witnesses, including economic, financial, engineering and cost experts.

The Consumer Advocate's additional argument that access revenues should be taken into account is confusing at best. The statute requires that the State USF be calculated based on the difference between the cost of providing basic local exchange service and the "maximum amount [the carrier of last resort] may charge for the services." S.C. Code Ann. Section 58-9-280(E)(4). The statute does not say the maximum amount it may charge for the services plus the amount of any revenues received from access services. In fact, the word "revenues" does not even appear in Section 58-9-280(E)(4).

An apparently related argument made by the Consumer Advocate is that the Commission's failure to allocate the costs of the network to services other than basic

local exchange service violates Section 254(k) of the Telecommunications Act, which provides in part that services included in the definition of universal service should be bear no more than a reasonable share of the joint and common costs of facilities used to provide those services. Consumer Advocate's Petition at 4-5, paragraph 8. This matter was fully litigated and resolved in the cost proceeding in this docket. As South Carolina Telephone Coalition witness Douglas Meredith testified in March 1998, the joint and common costs were allocated to the various services using the network, in full compliance with Section 254(k) of the Act. An excerpt of Mr. Meredith's testimony regarding the South Carolina Telephone Coalition companies' embedded cost methodology illustrates the invalidity of the Consumer Advocate's allegation:

> In order to develop an embedded cost of service for residential and business one-party service, JSI used information obtained from each cost company… the financial information obtained…included booked investment amounts, including depreciation reserves, for investments under Part 32 Accounting Rules. This financial information also included allowable expense amounts for the telecommunications activity of the company. *Finally, information relating to the operation of the company that relate to how shared and common investments and expenses are allocated, and the usage of the network for various types of calling activity, was obtained.* The actual cost information is allocated to department and then to functional components within department based upon the information provided by the company. These functional components are then combined to form a basic residential or business service cost. *This procedure uses cost allocation principles that are used in embedded cost methodologies. For instance, the switching function is allocated between local and toll calls.* The only notable exception to an embedded allocation procedure that was used under our analysis is in the treatment of the loop. In the current analysis, the loop is fully allocated to the basic service. This exception is consistent with the treatment of non-traffic sensitive (NTS) loop cost by the FCC, and is consistent with the treatment used by other companies involved in this proceeding.

See Prefiled testimony of Douglas Meredith in 1998 cost proceeding at 4-5 (emphasis added). Non-rural companies and Sprint/United also allocated the costs of the network,

albeit in a different manner, by subtracting the federal support per line (calculated at 25% of the difference between the cost per line and the FCC's national revenue benchmark) from the total cost to arrive at the state support per line. See e.g., Prefiled testimony of Peter F. Martin in USF cost proceeding at 4. Based on this testimony, the Consumer Advocate's argument is without merit.

However, in support of his argument regarding an alleged violation of Section 254(k) of the Telecommunications Act of 1996, the Consumer Advocate points to the Commission's finding that it was not appropriate to allocate the costs of the telephone network to services other than basic local service. The Consumer Advocate is clearly taking the Commission's finding out of context. As indicated by the sentence following the one cited by the Consumer Advocate, this Commission was clearly discussing "loop costs." Order No. 2001-419 at 41. As stated in Meredith's testimony quoted above, fully allocating the loop (which is a direct cost, as opposed to a joint or common cost) to basic service is consistent with the treatment of non-traffic sensitive loop cost by the FCC.

The Consumer Advocate argues that the cost studies are deficient because they fail to allocate 25% of the costs to the federal jurisdiction. Again, there has been no appeal by the Consumer Advocate of Order No. 98-322, and he cannot challenge the Commission's approval of specific cost methodologies and studies now. Furthermore, it is interesting to note that, in any event, the FCC has abandoned the 25%/75% federal/state split as far as responsibility for universal service funding, and instead has left it to the states to shoulder the burden of ensuring universal service. See FCC's Ninth Report and Order and 18th Order on Reconsideration, CC Docket No. 96-45, released

November 2, 1999, at paragraph 7. In any event, as discussed in the prior paragraph, the parties did allocate a portion of the cost to the federal jurisdiction. Those companies using the BCPM model made an allocation for the portion of USF assigned to the federal jurisdiction. The methodologies put forth by the South Carolina Telephone Coalition Companies for State USF take into account and back out the actual amounts received in federal universal service funding. Thus, there can be no double recovery from the State and federal jurisdictions.

One of the more puzzling allegations of the Consumer Advocate's Petition is the assertion that there is no probative evidence in the record to support the Commission's finding that intrastate access charges are priced above cost and provide significant support for basic local exchange service. BellSouth, Verizon, Sprint, and the South Carolina Telephone Coalition all presented testimony stating that a composite access rate of 3 cents is still above cost for the companies. (Tr., Vol. II at 358; Vol. III at 669; Vol. IV at 807-08, 822-24.) Even a witness for a party opposing implementation of the State USF testified that the cost of access was $.0055. (Tr., Vol. IV at 1004, Testimony of AT&T witness Tate). The Consumer Advocate goes so far as to state that "there is no evidence in this case to support a finding that basic local exchange services are receiving any implicity subsidy at all." Consumer Advocate's Petition at 3, paragraph 7. This statement is simply not true. In the prior cost proceeding, detailed information was provided regarding the cost of providing basic local service. The cost of providing service for many companies was shown to exceed the amount the company could charge for the service by $20 to $40 or more per month. Unless these companies are losing money at

phenomenal rates, there is clearly a subsidy flowing from rates like access and other services to basic local exchange service. Furthermore, it should again be emphasized that there has been no appeal by the Consumer Advocate of Commission Order No. 98-322, approving the cost models and methodologies that provide the basis for the size of the State Universal Service Fund.

Finally, the Consumer Advocate states that this Commission cannot mandate that interexchange carriers pass through access reductions in the form of lower long distance rates. None of the interexchange carriers who are parties to this proceeding raised this issue for reconsideration. We reject the Consumer Advocate's allegation.

In sum, the Consumer Advocate's Petition is denied.

**SECCA PETITION**

The Southeastern Competitive Carriers Association, WorldCom, Inc., and the South Carolina Cable Television Association filed a joint Petition for Rehearing or Reconsideration. This will be referred to hereinafter as the SECCA Petition, and the parties will be referred to collectively as SECCA. We grant in part and deny in part the SECCA Petition as will be explained below.

First, SECCA asserts that Commission Order No. 2001-419 fails to establish the size of the State USF, in violation of State law. Unfortunately, SECCA fails to acknowledge that the Commission previously sized the State USF using the statutory formula in our earlier cost proceeding in this Docket. Order No. 2001-419 orders implementation of the initial step of the State USF in the amount of approximately $38.4 million, or the amount necessary to fund access reductions by all incumbent LECs of

approximately 50% or to a composite rate of approximately 3 cents for both originating and terminating access. Order No. 2001-419 further sets up a process whereby LECs can, upon a detailed cost showing that implicit support exists in particular rates, reduce those rates and receive additional universal service funding for the removal of that implicit support. We believe that our approach was cautious and well-reasoned, since it establishes the amount of the State USF for the initial phase of implementation, and sets forth a process whereby the LECs can gradually identify and reduce the implicit support in other rates. Thus, the assertion of SECCA must be rejected.

Next, SECCA argues that the State USF is a barrier to entry because it permits incumbent LECs to "protect themselves from competition." To the contrary and as contemplated by the Telecommunications Act of 1996, the removal of implicit support in rates allows incumbent LECs to compete on a level playing field with competitive carriers who are not subject to the effects of historical residual price-setting. CLECs do not have an obligation to provide basic local exchange service at rates that are below the company's cost, as ILECs do, and thus do not have implicit support built into other rates. This is exactly the situation Congress was attempting to redress in providing for federal and State Universal Service Funding and the removal of implicit support in rates for services other than basic local exchange service. Therefore, there is no validity to the statement that the State USF is a barrier to entry because it affords "protection from competition" for the ILECs.

Further, SECCA alleges that the State USF is oversized because the Commission's approach in calculating the State USF mismatches costs and revenues by

using all of the costs associated with the facilities and only the revenues received from the basic local service. Again, there was no appeal by SECCA of Order No. 98-322, which approved cost models and methodologies to be used in sizing the State USF. SECCA may not therefore raise issues addressed by that Order in this portion of the case. In addition, even if it could, State law requires that the Commission size the State USF based on the difference between the cost of providing basic local exchange service and the maximum amount the carrier of last resort may charge for such service. The statute makes no provision for a consideration of "revenues," especially from services other than basic local service. This SECCA allegation is therefore without merit.

An additional assertion of SECCA is that the State USF is discriminatory because it permits withdrawal of funds only upon a showing that a local exchange company has reduced rates to remove implicit subsidies and, therefore, only incumbent LECs can withdraw from the State USF. This argument ignores the fact that State USF funding is portable, and that CLECs can withdraw from the State USF upon an appropriate showing. Initially, ILECs are the carriers of last resort in their respective service areas because they are the carriers that have undertaken the obligation to provide basic local exchange service to all requesting customers in those areas. However, CLECs may qualify as carriers of last resort upon an appropriate showing, according to the State USF Guidelines adopted by the Commission. Once a CLEC qualifies as a carrier of last resort, State USF funds are portable to that CLEC as provided for in the Guidelines. This is consistent with the purpose behind the State USF to ensure the continued provision of basic local exchange telephone service at affordable rates. If a particular CLEC is not eligible to

draw from the fund, it is only because that CLEC has not undertaken an obligation to provide universal service. Accordingly, the State USF is not discriminatory.

Further, SECCA alleges that Order No. 2001-419 conflicts with Federal law in contravention of the Federal Telecommunications Act of 1996 in its attempt to assess contributions to the State USF on interstate revenues. According to SECCA, interstate revenues are subject to a federal surcharge to support the federal USF, and the USF of Order No. 2001-419 impermissibly burdens federal universal service support mechanisms in violation of 47 USC Section 254(e) by imposing an additional state surcharge on those same interstate revenues. This allegation is without merit. We based our determination of this issue on a reasoned analysis of applicable law, and found that it was reasonable to include interstate revenues in the base of revenues on which State USF contributions are calculated. See Order No. 2001-419 at 37, paragraph 16. We noted that the revenues to be included are billed to end users *in the State of South Carolina*, and that both intrastate and interstate telecommunications services sold in South Carolina will benefit from Universal Service and should share in contributing to the State USF.

Finally, as SECCA notes in Paragraph 19 of Order No. 2001-419, this Commission adopted the recommendations of several parties that companies should be authorized to recover contributions to the USF through the use of a uniform percentage surcharge on end-user retail revenues. SECCA states that while a Company may have the option of whether or not to attempt to recover such contributions, if it decided to do so, SECCA believes that we intended to mandate the utilization of a surcharge. For clarification, SECCA requests that a sentence be added at the end of paragraph 19

providing as follows: "Therefore, any company attempting to recover contributions to the State Universal Service Fund shall do so through the use of a uniform percentage surcharge on end-user retained revenues." We grant clarification, and grant SECCA's request. We agree that our intent was to have anyone who exercises its option to recover contributions to the State USF to utilize the surcharge set out in our original Commission Order No. 2001-419. Accordingly, the sentence requested by SECCA as stated above is hereby added to the end of paragraph 19 of Order No. 2001-419.

Accordingly, SECCA's Petition is granted in part and denied in part.

**AT&T PETITION**

First, AT&T raises a ground similar to SECCA, i.e., that the Commission's decision to include revenues from interstate revenues for interstate telecommunications services in the base of contributions for the State USF exceeds the Commission's jurisdiction and improperly impairs interstate commerce. We disagree with and reject this assertion, based on the reasoning stated above in response to the SECCA Petition, and the language quoted from Order No. 2001-419.

Next, AT&T asserts that this Commission erred in failing to immediately transition the Interim LEC Fund into the State USF. This ground is without merit. As we properly found, the State USF is neither finalized nor adequate to support the obligations of the Interim LEC Fund, as required by S.C. Code Ann. Section 58-9-280(M). Thus, a transition of the Interim LEC Fund into the State USF is neither practical nor reasonable at this time.

AT&T also argues, apparently for the first time, that the Interim LEC Fund constitutes a "barrier to entry" because it is available only to incumbent LECs and not to competitive LECs. AT&T did not make this argument during the hearing on this matter. A Petition for Rehearing or Reconsideration "shall set forth…[t]he alleged error or errors in the Commission Order." S.C. Code Ann. Regs. 103-836(4)(b). The Commission cannot err with respect to an argument that was not presented during the hearing or in a post-hearing legal brief. However, even if the argument had been properly raised, it has no merit. The Interim LEC Fund was established by the Commission pursuant to a directive of the South Carolina General Assembly in order to bring about comparability of access rates among incumbent LECs in South Carolina. The Interim LEC Fund is a State fund created by State law for a specific purpose. It does not serve the same purpose as a Universal Service Fund.

Finally, AT&T requests that this Commission clarify that companies attempting to recover contributions to the State USF shall do so through the use of a uniform percentage surcharge on end-user retail revenues. As noted above, in our discussion of a similar point in the SECCA Petition, we agree with this assertion, and have ordered a modification to Paragraph 19 of Order No. 2001-419 to reflect our agreement with this proposition. This modification is consistent with that requested by AT&T. Accordingly, we grant AT&T's request for clarification on this point.

## CONCLUSION

We trust that we have addressed all of the concerns of the parties in this matter. Our goal in this Order was to clarify, when necessary, our directives in Order No. 2001-419, and to complete the establishment of the State Universal Service Fund in concert with our mandate from the South Carolina General Assembly. We believe that we have met that goal. This Order shall remain in full force and effect until further Order of the Commission.

BY ORDER OF THE COMMISSION:

Chairman

ATTEST:

Executive Director

(SEAL)

# EXHIBIT C

BEFORE

THE PUBLIC SERVICE COMMISSION OF

SOUTH CAROLINA

DOCKET NO. 97-239-C - ORDER NO. 2001-996

OCTOBER 10, 2001

| | | |
|---|---|---|
| IN RE: Proceeding to Establish Guidelines for an Intrastate Universal Service Fund. | ) | ORDER APPROVING FINAL DOCUMENTS AND VACATING ORDER NO. 2001-954 |

This matter comes before the Public Service Commission of South Carolina (the Commission) for approval of final Guidelines for the South Carolina Universal Service Fund (USF) and the South Carolina Universal Service Fund Administrative Procedures. The two documents were filed with this Commission by the South Carolina Telephone Association (SCTA) originally in this proceeding, and have been modified as instructed in our Order No. 2001-419, dated June 6, 2001 to reflect all changes ordered by us since adoption of the original guidelines by our Order No. 97-753, dated September 3, 1997, and are attached hereto as Exhibits A & B to this Order.

We have examined the submitted documents and do hereby find that they conform with and are in compliance with our previous Orders in this Docket, and that they correctly reflect this Commission's intent in establishing both Guidelines and Administrative Procedures. Accordingly, we approve both of the named documents attached hereto as final documents.

Commission Order No. 2001-954 is hereby vacated. This Order is intended to replace that Order.

This Order shall remain in full force and effect until further Order of the Commission.

BY ORDER OF THE COMMISSION:

Chairman

ATTEST:

Executive Director

(SEAL)

8/29/01

**EXHIBIT A**

# GUIDELINES FOR SOUTH CAROLINA UNIVERSAL SERVICE FUND (USF)

1. Definition of Universal Service

- The term "universal service" means the provision of basic local exchange telecommunications service, at affordable rates and upon reasonable request, to all single-party residential and single-line business customers within a designated service area.

- The term "basic local exchange telecommunications service" means for single-party residential and single-line business customers access to basic voice grade local service with dual-tone multi-frequency (DTMF) signaling (i.e., Touch-tone), access to available emergency services and directory assistance, the capability to access interconnecting carriers, access to dual party relay services, access to operator services, one annual local directory listing, and toll limitation at the request of the low income consumer or in order to prevent further losses by the carrier of last resort, for low-income consumers participating in Lifeline (subject to technical feasibility).

- As initial carriers of last resort, ILECs shall establish designated service areas that shall not be inconsistent with federal guidelines (i.e., study area for rural companies and wire center or smaller areas for non-rural companies). A new entrant may not receive USF support for serving an area that is smaller than the ILEC's designated service area.

- After Notice and an opportunity for a hearing to all affected carriers, the Commission by rule may expand the set of basic local exchange telecommunications services within the definition of universal services based on a finding that the uniform statewide demand for such additional service is such that including the service within the definition of universal services will further the public interest; provided, however, that before implementing any such finding, the Commission shall provide for recovery of unrecovered costs through the USF of such additional service by the affected carrier(s) of last resort.

2. Carrier of Last Resort

- Telecommunications carriers that assume the obligations of carrier(s) of last resort (COLRs) will be eligible to receive intrastate universal service support. Carrier(s) of last resort will be designated by the Commission. Carrier(s) of Last Resort are "eligible telecommunications carriers" as defined in Section 214(e) of the federal Telecommunications Act of 1996, but not all eligible telecommunications carriers are carriers of last resort.

- To be designated a COLR by the Commission, a carrier must meet the following requirements:

  - The COLR must be willing and able and must certify its commitment to provide the defined services supported by the State USF to any requesting customer's location within the designated service area as defined in paragraph 1;

  - The COLR must advertise the availability of such services and the charges therefor using media of general distribution;

  - The COLR must provide its services at not more than the Commission-authorized maximum stand-alone rates for the defined basic local exchange telecommunications service, and must meet all service quality and provision rules established by the Commission for universal services;

  - The COLR may satisfy its obligation to provide the defined services over its own facilities or a combination of its own facilities and resale of another carrier's services. The COLR may also satisfy its obligation to provide the defined services in whole or in part through the lease of unbundled network elements (UNEs). A carrier that provides service solely through the resale of other carriers' facilities is not entitled to universal service support.

3. <u>Administration of the USF</u>

- The South Carolina Public Service Commission (the Commission) shall act as Administrator for the South Carolina Universal Service Fund (USF), as set forth in Section 58-9-280(E)(1) of the South Carolina Code.

- The Administrator shall be charged with periodically determining the level of contributions required and assessing the various contributors to meet the distribution needs of the USF.

- A single USF shall supply the funding requirements for all South Carolina universal service programs. The South Carolina Interim LEC Fund, established by the Commission pursuant to Section 58-9-280(M) of the South Carolina Code, will transition into the USF when funding for the USF is finalized and adequate to support the obligations of the Interim LEC Fund.

- The data necessary to administer the USF shall be handled in a proprietary manner. Total industry aggregated data may be released, as determined by the Commission, so long as no individual company's data is discernable.

- The Administrator is responsible for assessing telecommunications carriers, distributing funds to the various qualified recipients, preparing and filing with the Commission and providing participants with the results of an annual audit of the fund performed by an independent third party, and making recommendations to the Commission pertaining to the ongoing operation and modification of the fund.

- The Administrator shall perform annual audits of the USF participants, if needed. The Administrator's audit authority shall be limited to the review of data necessary to ensure that all contributions are accurately assessed and distribution claims are valid.

- The administration of all aspects of the fund shall be done in a competitively neutral manner, as provided for in the FCC's First Report and Order in CC Docket No. 96-45, at paragraph 46.

4. Revenue Neutrality

- Effective with implementation of the USF, incumbent LECs should reduce prices for intrastate services that include implicit support for universal service to offset the gross amount received from the USF. Such price reductions shall be designed to be revenue neutral to the carrier upon implementation of the USF. In the event the Commission were to disallow the explicit recovery of incumbent LECs' contributions to the USF through an explicit end user surcharge, such prices shall only be reduced by the net amount of universal service support that is received.

5. Contributions to the USF

- Contributors to the state USF will be identified in accordance with Section 254 of the federal Telecommunications Act of 1996 and Section 58-9-280(E) of the South Carolina Code.

- All telecommunications carriers and other providers offering telecommunications services within the State of South Carolina must contribute to the USF. Companies are deemed to be offering telecommunications services in South Carolina if such telecommunications is being offered "for a fee"; and such telecommunications is being offered to an end user, or to such classes of users as to be effectively available to an end user.

- For purposes of the South Carolina Universal Service Fund, the federal definition of "telecommunications" is adopted and is defined as a "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." Examples of telecommunications include, but are not limited to: wireless services where they compete with a local telecommunications service provided in this State; operator services; access services; wide area telephone services (WATS); toll-free services; 900 services; message telephone services (MTS); private line services; telex services; telegraph services; video and satellite services to the extent that they meet the definition of telecommunications (excludes content and one-way cable television service); pay telephone services; and wholesale services such as toll switched access, dedicated access, unbundled network elements, resale, etc.

- The phrase "for a fee" means services rendered in exchange for something of value or a monetary payment. "For a fee" includes the services offered to the general public by either a common carrier or a non-common carrier, (e.g., a private network provider). "For a fee" does not mean "for-profit."

- All telecommunications carriers offering services within the state shall contribute to the USF on the basis of their relative shares of all retail "end user" telecommunications revenues generated by and/or billed to an end user in the State of South Carolina. Payphone service providers shall contribute to the State USF based on end user revenues, and not the payphone service providers' local telephone service bills. Charges by local or long distance telecommunications carriers to Payphone Service Providers ("PSPs") for toll or access line charges are not retail "end user" telecommunications revenues, and do not serve as a basis for that local or long distance telecommunications carrier's contribution to the USF. As such, local and long distance telecommunications carriers are prohibited from passing any USF charges on to their PSP customers.

- If a contributor's annual contribution would be less than $100, it will not be required to contribute for that year.

6. Distributions from the USF

- Distributions of monies in the USF shall be made monthly to each eligible COLR.

- A COLR shall only receive USF support for the provision of the defined service that utilizes its own facilities or leased unbundled network elements. Any USF distributions associated with resale of another carrier's services would be provided to the underlying COLR.

- The COLR may satisfy its obligations to provide the defined services in whole or in part through the lease of unbundled network elements (UNEs). However, the level of USF support such a carrier may receive shall not exceed the difference between the sum of the prices paid for the UNEs utilized in providing the defined basic local exchange telecommunications service and the established maximum price allowed to be charged to the end user customer. In addition, the UNE purchaser may recover certain expenses it incurs in addition to the cost of the UNEs themselves. A realistic surrogate for those expenses incurred by a UNE purchaser is the percentage deducted for "avoided costs" from the resale price for CLECs by an ILEC. Support provided to the UNE purchaser shall not exceed the level of support provided to a facilities-based provider. The ILEC providing non-discriminatory access to UNEs to competing COLRs shall receive the difference between the level of universal support provided to the competing COLR and the per-line support previously provided to the ILEC.

- A COLR that provides USF services using its solely-owned and constructed network will be entitled to receive the full amount of per-line USF support.

- The COLRs which provide the underlying facilities to resale competitors will be entitled to receive the full amount of per-line USF support for those facilities.

- Carriers providing services on the basis of resale (in which facility requirements are not met) are not eligible to receive USF support.

- Fund payments shall be distributed to providers of supported services based upon Commission-approved guidelines. All providers must submit reports to the Administrator in order to receive payments. The Administrator shall establish procedures to verify payment claims and may suspend or delay payments to a provider if such provider fails to provide adequate verification upon reasonable request or if directed by the Commission to do so.

- The receipt of funding from the State USF is predicated upon the cost of providing basic local exchange telecommunications service to a consumer and is not earnings based.

- The universal service funding is portable to any qualified carrier of last resort.

- The funding is associated with each individual single-party residential or single-line business line regardless of its classification as a primary or non-primary line.

7. Adjustments to Contribution and Distribution Levels

- The Commission/Administrator shall have the authority to make adjustments to the contribution or distribution levels based on yearly reconciliation, or more often if deemed necessary for efficient management of the USF, and to order further contributions or distributions as needed.

- Any excess funds not distributed during a Plan year shall only be used to reduce the following Plan year's funding contribution requirement. Any funding shortfall existing at the end of a Plan year shall be added to the contribution requirement in the following Plan year.

8. Recovery of USF Contributions

- Contributions to the USF may be recovered through an explicit surcharge on retail customers' bills. A carrier may choose not to recover its contribution. However, any carrier attempting to recover contributions to the State USF shall do so through the use of a uniform surcharge on end-user retail revenues. Any surcharge applied to end user retail revenues by the carrier shall not exceed the percentage assessed to the carrier, as determined by the Commission Staff.

- The USF Administrator shall develop an explicit uniform retail surcharge percentage to be used as a USF contribution recovery mechanism. The USF surcharge may be applied to the retail revenue billed to all end users of telecommunications. The surcharge shall be updated at least annually and shall be applied in a manner consistent with the contributions collected by the Administrator, including periodic updates.

9. Size of the fund

- The maximum size of the state USF (which includes provisions for high cost and low income support) shall be the sum of the differences, for each ILEC carrier of last resort, for each of its designated state USF support service areas, between the cost of providing basic local exchange telecommunications services less the maximum amount (as approved by the Commission) it may charge for basic local exchange telecommunications service within each area and less any federal universal service support received for serving the same area ("high cost support component"), plus the cost of any state mandated support programs for low-income consumers such as Lifeline, as well as any appropriate administrative expenses. The high cost support component is calculated on a per-line basis for residential and single-line business service, then summed over all such lines in the designated state USF support area.

- The state USF should be implemented in three or more phases. The Initial Phase of the state USF will implement up to 33% of the total state USF and will consist of two steps. The first step will consist of a reduction in intrastate access rates and the second step will consist of reductions in other rates providing implicit support for universal service.

- The first step of the Initial Phase of the state USF will include: 1) the sum of the dollars required for each ILEC to reduce its intrastate access rates from their level as of October 1, 2001 to the target level proposed by each ILEC, plus 2) the cost of any state-mandated support programs for low-income consumers such as Lifeline, and 3) appropriate administrative expenses.

- After implementation of the first step, but no later than April 1, 2002, the ILECs may file tariffs to reduce other rates providing implicit support. Such filings will be considered by the Commission and a decision rendered by September 1, 2002 for inclusion in the state USF effective October 1, 2002. The amount of these reductions for all ILECs when combined with the amount of the access reductions taken in the access step will equal no more than 33% of the total state USF. If a rural ILEC's access reductions exceed the first year's maximum ceiling of 33% for that rural ILEC, the rural ILEC will still be permitted to make its targeted access reductions. To maintain the overall ceiling, BellSouth agrees to limit its second step tariff reductions by the amount necessary to insure that no more than 33% of the total state USF is implemented in the first year.

- After the Initial Phase, on April 1 of each year, beginning in 2003, each ILEC receiving USF support may file tariff reductions and request additional USF support to fund the continued removal of implicit support contained in rates. Such filings will be considered by the Commission and a decision rendered by September 1 of the same year for inclusion in the state USF as sized each October 1. The total high cost support for each ILEC for the 2nd phase shall not exceed 66.67% of its maximum high cost support.. No ILEC shall be required to implement any portion of the state USF other than the access rate reductions that ILEC committed to in the first step of the Initial Phase.

- The incremental high cost support amount per Residential and Business line for each phase shall be calculated by dividing the revenue reductions resulting from tariff reductions by the total universal service access lines, considering the relationship between the maximum high cost support between Business and Residence per line amount approved by the Commission. The total high cost support amount per Residence and Business line for each phase shall be the sum of 1) previous phase high cost support amount per line plus the incremental state high cost support amount per line, by Business and Residence, respectively plus 2) the incremental high cost support amount per Residence and Business line for the current phase. The total size of the fund in each phase shall be the support amount times the number of USF lines, plus the cost of any state-mandated support

programs for low-income consumers such as Lifeline, plus appropriate administrative expenses.

- The Commission-approved costs of providing universal service on a per line basis for any particular LEC should remain in place until such time as that LEC's State USF withdrawal exceeds one-third of its company-specific State USF amount. At that point, the LEC will be required to update the results of its forward-looking cost model, or in the case of rural LECs other than United Telephone Company, its embedded cost study.

- The Administrator may use estimates to establish the size of the USF on an annual basis, provided it establishes a mechanism for adjusting any inaccuracies in the estimates. Such a mechanism should allow for periodic adjustments, which will enable the Administrator to efficiently manage both the collection and distribution of the USF.

- Non-telecommunications services shall not be supported by the USF, nor will revenues received from non-telecommunications services be used to support USF.

- With the implementation of the initial phase of the State USF, those and any further access reductions made by ILECs as a result of access rate reductions implemented pursuant to a State USF proceeding by the largest LEC operating in the state shall be recovered solely through the State USF.

- The Interim LEC Fund will transition into the USF when funding for the USF is finalized and adequate to support the obligations of the Interim LEC Fund, in addition to its other obligations.

10. <u>Designation of Eligible Telecommunications Carriers</u>

- Pursuant to Section 214(e) of the federal Telecommunications Act of 1996 and to the FCC's Universal Service Report and Order released on May 8, 1997, state commissions must, either upon their own motion or request, designate a common carrier that meets the requirements of Section 214(e)(1) "as an eligible telecommunications carrier for a service area designated by the State commission." Upon notice to the State, the Commission shall permit eligible carriers to relinquish their designation as an eligible carrier in areas that are served by more than one eligible carrier.

- Incumbent local exchange carriers shall notify the Commission by letter, on or before October 1, 1997, of their desire to be appointed as eligible telecommunications carriers in designated service areas. The Commission shall consider the companies' requests and may render a single decision. Companies must, however, be designated as eligible before December 31, 1997, in order to receive federal universal service funds for 1998.

11. Rates

- The Commission should investigate and determine the appropriate single-party residential and single-line business rates for the State of South Carolina for each ILEC operating in South Carolina. The Commission shall allow an ILEC to charge any rate or rates determined to be appropriate or affordable for purposes of calculating state USF support for that ILEC. Such rates would represent the maximum rate that a carrier of last resort is authorized to charge an end user customer for the supported basic local exchange telecommunications service (except that discounts may be available to end users under the residential Lifeline program).

- Until such time as the Commission conducts hearings to establish appropriate maximum rates, the maximum rates for determining universal service support shall be deemed to be the COLR's tariffed rates for residential and single-line business services.

  - If funding for the state USF is subsequently reduced, COLRs should be able to increase rates an amount equal to the reduction in funding.

  - The Commission shall not require services not supported by universal service funding to be priced below their cost.

12. Low-income Consumers

- Support for a statewide Lifeline program shall be part of the USF.

- The Lifeline and Link-up programs for low-income consumers shall not be inconsistent with federal guidelines.

- A consumer's qualification for support should be determined by the Commission. The Commission shall establish narrowly-targeted qualification criteria that are based solely on income or factors directly related to income.

- Consumers meeting qualifying criteria should be free to select any eligible provider of their choice.

- The Commission shall take the necessary steps to maximize the benefit of the FCC's federal Lifeline program for qualified telecommunications customers in the State of South Carolina.

13. Discounts for Schools, Libraries, and Public and Non-Profit Health Care Providers

- The Commission finds that the same discounts for schools and libraries are adopted for intrastate as those specified for interstate rates and charges in the FCC's Universal Service Report and Order released on May 8, 1997. The Commission authorizes incumbent LECs the same intrastate pricing flexibility to bid for services to schools and libraries as the FCC has provided for interstate services in para. 483 of its Universal Service Report and Order released on May 8, 1997.

- The Commission establishes the necessary intrastate regulatory framework to enable South Carolina's public and non-profit health care providers located in rural areas, and telecommunications carriers serving such health care providers, to take full advantage of all aspects of the federal universal service program for health care services. The federal program for rural health care providers is outlined in the FCC's Universal Service Report and Order released on May 8, 1997.

EXHIBIT B
August 29, 2001

**SOUTH CAROLINA UNIVERSAL SERVICE FUND**
**ADMINISTRATIVE PROCEDURES**

I. Definitions:

1. SUPPORTED SERVICES: Supported services consist of basic local exchange telephone service to all residential and single-line business customers in designated support service areas.

2. DESIGNATED SUPPORT SERVICE AREA: The designated support service area is defined as the geographic area eligible for state universal service support. The designated support service area is based upon a wire center for non-rural incumbent local exchange companies ("ILEC") and Sprint United Telephone Company and study area for rural ILECs other than Sprint United Telephone Company.

3. CARRIER OF LAST RESORT: In the context of universal service, any carrier that applies for Carrier of Last Resort ("COLR") status and receives approval from the Commission to provide the supported services to a designated support service area is eligible for high cost support per line. Carriers that provide service as a reseller are not eligible to be COLRs.

4. HIGH COST SUPPORT PER LINE: High Cost Support Per Line is the amount of state universal service support within each designated support service area available for an individual residential or single-line business line.

5. HIGH COST SUPPORT: High Cost Support is the amount each COLR receives from the South Carolina Universal Service Fund ("SC USF"). This amount is calculated by multiplying the High Cost Support per Line by the number of eligible lines served by each COLR.

6. HIGH COST SUPPORT COMPONENT: The High Cost Support Component is the sum of high cost support for all COLRs in SC and represents a subsection of the total SC USF.

7. ADMINISTRATIVE EXPENSE COMPONENT: This component consists of costs incurred by the Commission-designated Administrator of the SC USF in the administration of the SC USF, including the audit expenses of an independent third party. The sole purpose of this component is to recover Commission-approved costs for administering the SC USF.

8. LOW INCOME SUPPORT PER LINE: The Low Income Support per Line is the amount of state support available to eligible low income consumers and is equal to

the state-matching portion (currently $3.50) of the Federal Lifeline credit. It is payable to the COLR serving the eligible low-income consumer.

9. FUND PARTICIPANTS: Participants in the SC USF include both those telecommunications carriers that contribute into the fund and those Carriers of Last Resort that are entitled to receive disbursements from the SC USF.

## II. SC USF Components

The SC Universal Service Fund consists of:

- The High Cost Support Component
- The Low-income Support Component
- The Administrative Expense Component.
-

The SC Universal Service Support is the sum of the three components stated above.

## III. Contributions to the SC USF

A. All telecommunications carriers, as defined in the Telecommunications Act of 1996, providing telecommunications service within the State of South Carolina shall contribute to the SC USF based upon their relative shares of all end user retail telecommunications revenues (both interstate and intrastate) generated by and/or billed to an end user in South Carolina.

B. Retail end user telecommunications revenues shall be reported and filed using a reporting form developed by the Administrator ("USF Contribution Worksheet) (Attachment I). Each affiliate or subsidiary must file separately. The Form must be certified by an officer of the contributor, and is subject to verification by the Administrator. A contributor is required to submit a revised form, in a timely manner, should a reporting error be discovered.

C. Each carrier must file on an annual basis the information necessary to allow the Administrator to calculate the carrier's contribution. These filings will be due on July 1 of each year, reporting data as of December 31 of the prior calendar year.

D. The Administrator shall calculate the contribution factor based upon the ratio of the fund size implemented to retail end user revenues reported as set forth in this section.

E. The Administrator will then multiply the contribution factor by each contributor's end user retail telecommunications revenues to develop its assessment. Based upon that data, each contributor's contribution will be determined for the subsequent year, and the contributor will be notified by September 1 of each year of its annual contribution. The Administrator will render monthly bills representing one-twelfth

of the contributor's annual contribution, with the first payment being due on the date specified by the Administrator.

F. In the event that contributions exceed SC USF payments and administrative costs, the contribution factor for the following annual period will be adjusted by an appropriate amount, taking into consideration projected distributions. In the event that contributions are inadequate, the Administrator may reduce payments to recipients on a pro-rated basis and add the shortfall to the contribution requirement for the following annual period. Any payment shortfall from the previous annual period shall be paid to the affected COLRs during the period those shortfall amounts are collected.

G. Each contributor will remit payments to the USF not later than the first of each month, beginning November 1, 2001. Late payment charges will begin to accrue by the 30th of the month in which payment is due. Late payments to the USF will be assessed at the rate of .0493% per day. The Administrator may also bill contributors for reasonable administrative expenses and interest resulting from improper filing or overdue contributions.

H. If a contributor's annual contribution would be less than $100, it will not be required to contribute for that year. This does not, however, exempt such telecommunications provider from submitting a completed USF Contribution Worksheet.

IV. <u>Distributions from the SC USF to Eligible COLRs</u>

A. COLRs designated by the South Carolina Public Service Commission (Commission) shall be eligible to receive funds from the SC USF pursuant to the procedures set forth below.

B. In order for a COLR to receive distributions it must provide Basic Local Exchange Telecommunications Service, at rates not to exceed the Commission authorized maximum stand-alone rates for the ILEC serving that Designated Support Service Area.

C. Support payments shall be distributed to COLRs by the last day of each month (beginning November 2001) based on rules approved or modified by the Commission.

D. COLRs will receive High Cost Support based upon the number of eligible residential and single-line business lines served by such COLR in a Designated Support Service Area. The amount of High Cost Support is determined by multiplying the number of eligible lines by the per line support available for such lines in the designated support service area.

E. The SC High Cost Support per line, for Residential and single-line Business, shall be calculated based on the incumbent LEC's cost of providing basic local exchange service minus the revenues received for such services, by class of service.

In Designated Support Service Areas where more than one COLR provides local service:

1. The level of SC High Cost Support that a COLR may receive shall not exceed the difference between the sum of the prices paid for the UNEs utilized in providing the defined basic local exchange telecommunications service plus additional costs incurred by the CLEC (as provided for in paragraph 25 of SC PSC Order No. 2001-419 in Docket No. 97-239-C) and the established maximum price allowed to be charged by the incumbent LEC to the end user customer in the Designated Support Service Area.

2. The ILEC providing nondiscriminatory access to unbundled network elements to such competitive eligible telecommunications carrier shall receive the difference between the level of the universal service support provided to the competitive eligible telecommunications carrier and the per-line level of support previously provided to the ILEC.

3. The COLR (other than LEC) that provides the supported services using neither UNEs purchased from ILEC nor wholesale service purchased for resale will receive the full amount of universal service support previously provided to the ILEC for that customer.

F. The SC USF will be sized as of October 1, 2001 based on access reductions made by COLRs and on October 1 of each subsequent year based on tariff reductions approved by the Commission.

G. Low-income Support per Line shall be available to any COLR serving a customer participating in a state mandated support program for low-income consumers such as Lifeline.

V. Phased Approach to the High Cost Support

In order to properly identify and reduce those intrastate tariff rates providing implicit support to Universal Service and to allow the Commission to have proper oversight of the process, the High Cost Support Component shall be phased in over time.

The phased approach only relates to implementing the High Cost Support Component of the state USF over time. The SC USF shall be limited to no more than 33.33% of the SC Universal Service Fund in the first year and no more than 66.67% in the second year. Such total amount must include funding associated with the low-income and administrative expense components of the SC USF.

The earliest date the State USF could fully be implemented will be 10/1/2004. However, full implementation of the High Cost Support Component may actually take longer, as no COLR is required to implement the maximum percentage in any given year.

Prior to implementation of any funding over one-third of the High Cost Support for a particular ILEC, that ILEC is required to submit updated cost studies.

The implementation of the second step of the initial phase and of the remaining phases requires tariff filings by individual ILEC(s) reducing intrastate tariffed rates that include implicit support for universal service in South Carolina. The size of the High Cost Support component shall be equal to the revenue reductions realized by ILECs as the result of reducing regulated tariffed charges, as reflected in individual tariff filings.

The description for the phases is as follows:

A. "Initial Phase" - The High Cost Support in the initial phase shall be limited to no more than one third (33.33%) of the State USF,[1] for each ILEC. The initial phase shall consist of two steps:

1. The first step will be a reduction in intrastate switched access rates. All ILECs shall implement this step at the same time.

2. The second step will be the result of reducing other rates containing implicit support. No ILEC shall be required to participate in the second step of the initial phase. However, any ILEC electing to participate in this step must file tariffs to reduce rates and must also file detailed cost data clearly demonstrating that implicit support exists in the rates that are proposed to be reduced. The tariffs and cost data must be filed no later than April 1, 2002 and the Commission's decision will be rendered by August 1, 2002.[2]

---

[1] The limit of 33.33% is applied to the cumulative result for both steps in Phase 1 (access step and reduction of implicit support) plus the Low Income Component and Administrative Expense Component, if any.

[2] Such filings shall be considered by the Commission and a decision rendered. Rate Reductions approved by the Commission shall be effective October 1 of 2002, 2003, etc. The High Cost Support shall be equal to the revenue reductions as the result of reduced tariffed rates approved by the Commission.

Since the initial phase implementation of the SC USF is limited to no more than one third (1/3) of the total fund as approved by the Commission, and the first step may result in more than one third for some ILECs, in order to maintain the overall ceiling, BellSouth agrees to limit its second step tariff reductions by the amount necessary to ensure that no more than one third (1/3) of the total SC state USF is implemented in the initial phase.

B. "Second Phase" – The Second Phase for implementation of the SC USF shall be limited to no more than two thirds (66.67%) of the total State USF, for each ILEC. During this phase, an ILEC may request additional state USF in order to make reductions in tariffed rates for services providing implicit support to the universal support services. ILECs deemed eligible to receive SC High Cost Support may file tariffs to reflect reduction(s) in tariffed intrastate rates providing implicit support to universal service in South Carolina. Companies seeking rate reductions shall also file detailed cost data clearly demonstrating that implicit support exists in the rates that are proposed to be reduced. Any such tariff filings shall be made by April 1, 2003 and the Commission's decision will be rendered by August 1, 2003. Per line support from this phase of implementation shall be added to the per line support from the preceding phase to determine the total portable amount per line.

C. "Subsequent Phases" – Subsequent Phases of implementation allow an ILEC the option to complete the transition to the full amount of High Cost Support for which it is eligible in each Designated Support Service Area. During these phases, starting on April 1 of 2004, and on April 1 of each subsequent year, each ILEC receiving state USF support may file tariff reductions and request additional USF support to fund the continued removal of implicit support contained in rates. Any such tariff filing shall be accompanied by detailed cost data clearly demonstrating that implicit support exists in the rates that are proposed to be reduced. The Commission shall render its decision by August 1 of that year. Per line support from this phase of implementation shall be added to the per line support from the preceding phases to determine the total portable amount per line.

D. All ILECs shall participate in the first (access) step of the Initial Phase. However, an ILEC is not required to participate in the second step of the Initial Phase or in any other phase, but may elect to wait for a subsequent yearly phase. In no event, however, may a COLR receive more than the maximum of the amount of High Cost Support for a given designated support service area. Since ILECs' actions are optional in both the second and subsequent phases, ILECs may have a different ending period for reaching the maximum amount of universal service support. Each time the Commission approves the removal of implicit support from an ILEC's rates, the resulting per line support shall be added to the ILEC's existing per line support from preceding phases in order to develop the total portable per line support.

E. Non-ILECs designated as COLRs may petition the Commission to initiate a proceeding to implement an additional phase of the universal service support mechanism in a Designated Service Support Area.

VI. Calculation of per Line Support

A. High Cost Support Per Line is calculated as the difference between the Commission-approved cost per line of providing the universal supported services and the sum of the following: maximum Commission approved basic local service rates within each Designated Support Service Area, the Federal Universal Service Support[3] and Federal Subscriber Line Charge associated with the supported line. The High Cost Support per line is portable to COLRs, as set forth in Section IV, above. See Attachment II for an illustrative example of calculation of state High Cost Support.

B. For the purpose of determining the applicable High Cost Support per line in each Designated Support Service Area where the fund is established in phases, the per line calculation of USF is calculated as follows:

Initial Phase – First Step

For the first step, the High Cost Support for each Residential and single-line Business line in each Designated Support Service Area will be determined on a per line basis by calculating the total revenue reduction, resulting from reducing intrastate access rates to a composite proposed rate, as a percentage of the High Cost Support and then multiplying the calculated percentage by the High Cost Support per Residential and single-line Business line. (See Attachment III for an illustrative example.)

2. Initial Phase – Second Step

The High Cost Support per residential and single-line business line for this step of the first phase shall be determined using the following steps:

---

[3] Only the high cost loop portion of the Federal Universal Service Support is included for the rural LECs that utilized the embedded cost studies for SC USF calculations. The FCC through a series of orders in Docket number 96-45 transitioned various federal funds into one support mechanism referred to as Federal Universal Support cost recovery mechanisms, while maintaining their separate identities: high cost loop support (formerly Federal USF), local switching support, long term support, lifeline (SLC waiver and lifeline connection) & schools, libraries, and rural healthcare.

(a) Re-calculate the High Cost Support, using the Authorized Maximum Rate, Federal High Cost Support, Federal Subscriber Line Charge, and State USF lines as of December 31 of each year.

(b) Calculate the revenue reduction associated with reducing rate(s) containing implicit support as the percentage of High Cost Support from (a) above.

(c) Multiply the percentage calculated in (b) above by the High Cost Support per Residential and single-line Business Line from (a) above.

(d) Add the per line amounts calculated in (c) to the support per line developed in (1) above to determine the cumulative High Cost Support per line for this phase of implementation. (See Attachment IV for an illustrative example.)

3. Subsequent Phases

Per line support for both residential and single-line business lines shall be re-calculated each subsequent phase of implementation, in the same manner as in 2(a) through 2 (c) above and then added to the High Cost Support per single-line Business and Residence per line as approved by the Commission for the previous period, respectively. (See Attachment V for an illustrative example.)

VII. Data Requirements

A. Each ILEC must file by August 17, 2001 such information as is required by the Commission to determine the impact of access reductions approved by the Commission and the total amount of Lifeline funding needed by the ILEC.

B. Each ILEC must file the following data by July -1, 2002, and each year thereafter, on a form prescribed by the Commission, by Designated Support Service Area. The following data should be reported for the prior calendar year (as of December 31):

1. Number of residential USF access lines served by USF Designated Support Service Area rate group.
2. Number of single-line business USF access lines served by USF Designated Support Service Area rate group.
3. Federal USF High Cost Support per access line for USF Designated Support Service Area.
4. Authorized residential rate for each Designated Support Service Area.

5. Authorized single-line business rate for each Designated Support Service Area.
6. Appropriate subscriber line charges for (1) and (2) above.

In addition to the data above, each ILEC must also file the number of lines receiving federal Lifeline assistance as of December 31 of the previous calendar year.

## VIII. Responsibilities of the Administrator

A. The Administrator is responsible for assessing telecommunications carriers, distributing funds to the various qualified recipients, filing with the Commission the results of an annual audit of the fund performed by an independent third party, and making recommendations to the Commission pertaining to the ongoing operation and modification of the fund.

B. The data necessary to administer the SC USF shall be handled in a proprietary manner. Total industry aggregated data may be released, as determined by the Commission, so long as no individual company's data is discernible.

C. The Administrator shall perform annual audits of the SC USF participants, if needed. The Administrator's audit authority shall be limited to the review of data necessary to ensure that all contributions are accurately assessed and distribution claims are valid.

D. The Administrator shall compute the universal service contribution factor for the telecommunications carriers as described in Section III, on an annual basis.

<u>ATTACHMENTS:</u>

I: USF Contribution Worksheet
II: Example of Update to SC USF High Cost Support
III: Example of Initial Phase First Step Calculation
IV: Example of Initial Phase Second Step Calculation
V: Example of Second and Subsequent Phase Calculation

ATTACHMENT I

## South Carolina Universal Service Fund Contribution Worksheet

**Contributor Identification Information:**

101 Legal name of reporting entity: ______________________________
______________________________________________

102 IRS employer identification number: ______________________________
______________________________________________

103 Name telecommunications service provider is doing business as if different than shown above: ______________________________

104 Complete mailing address of reporting entity:
______________________________________________
______________________________________________
______________________________________________

105 Individual who completed this worksheet: ______________________________
______________________________________________

106 Telephone number of individual completing the worksheet: ______________

107 Fax number of individual completing the worksheet: ______________

108 Address that Universal Service Fund bills should be sent: ______________
______________________________________________
______________________________________________

109 Contact person at your Company for Universal Service Fund billing questions: ______________________________

110 Contact person's (in 109 above) telephone number: ______________

## South Carolina Universal Service Fund Contribution Worksheet

**Certification of Revenues:**

111 Revenues:

(a)Total Interstate End User Operating Revenues in South Carolina for 12 months period ending 12/31/2000: ____________________

(b)Total Intrastate End User Operating Revenues in South Carolina for 12 months period ending 12/31/2000: ____________________

(c)Total Interstate and Intrastate End User Operating Revenues in South Carolina for 12 months period ending 12/31/2000: ____________________

111 Certification of Report: I certify that I am an officer of the above named reporting entity, that I have examined the foregoing report and to the best of my knowledge, information, and belief, all of the statements in this Contribution Worksheet are true and that said Worksheet is an accurate statement of affairs of the above named Company for the time period of covered in this report.

Signature: ____________________ Date: ____________________

Printed name of Officer signing above: ____________________

Position of Officer signing above: ____________________

SWORN TO AND SUBSCRIBED BEFORE ME
this the ________ day of ________________, 20____

____________________________________
NOTARY PUBLIC for
My Commission Expires: ____________________

# ATTACHMENT II

**Example of Update to the State High Cost Support,**

South Carolina State USF Calculation

| **Data as of 12/31/2001, Reported by 7/1/2002** | **Source** | **Col. A Residence** | Col. B **Business** |
|---|---|---|---|
| 1. Cost per line, approved by the Commission | ***SC USF Order*** | $ 41.52 | $ 41.52 |
| 2. Authorized Maximum Rate | **Approved Tariff** | $ 13.25 | $ 26.50 |
| 3. Federal per line Support | FCC | $ 2.50 | $ 2.50 |
| 4. Subscriber Line Charge | FCC | $ 3.50 | $ 6.00 |
| 5. Net State High Cost Support per Line | L1 – (L2+L3+L4) | $ 22.27 | $ 6.52 |
| | | | |
| 6. State USF lines as of 12/31/2001 | Company Records | 11,500 | 2,500 |
| | | | |
| 7. State High Cost Support | L5 * L6 | $ 256,105 | $ 16,300 |
| 8. Total State High Cost Support per month | L7 (Col. A + Col. B) | $ 272,405 | |

ATTACHMENT III

**Example of Initial Phase First Step Calculation**

South Carolina State USF Calculation

| **Company Specific Data** | **Source** | **Col. A Residence** | **Col. B Business** |
|---|---|---|---|
| 1. Net State High Cost Support per Line | Att. II, L5 | $ 22.27 | $ 6.52 |
| | | | |
| 2. State USF lines as of 12/31/2001 | Att. II, L6 | 11,500 | 2,500 |
| | | | |
| 3. State High Cost Support | L1 * L2 | $ 256,105 | $ 16,300 |
| 4. Total State High Cost Support per month | L3 (Col. A + Col. B) | $ 272,405 | |
| | | | |
| **I.A. Calculation of Step 1 of Phase I** | | | |
| | | | |
| 5. Access Revenue Reductions | Calculation | $ 60,000 | |
| 6. % State USF implemented | L5 Col. A/L4 Col. A | 22.03 % | |
| 7. High Cost Support per line per month | L6 Col. A * L1 | $ 4.91 | $ 1.44 |

ATTACHMENT IV

**Example of Initial Phase Second Step Calculation**

South Carolina State USF Calculation

| **Adjustment to the High Cost Support for 10/1/2002** | **Source** | *Col. A* **Residence** | *Col. B* **Business** |
|---|---|---|---|
| Data as of 12/31/2001 – Reported by 7/1//2002 | | | |
| 1. Cost per line, approved by the Commission | SC USF Order | $ 41.52 | $ 41.52 |
| 2. Authorized Maximum Rate | Approved Tariff | $ 13.25 | $ 26.50 |
| 3. Federal per line USF support | FCC | $ 2.50 | $ 2.50 |
| 4. Subscriber Line Charge | FCC | $ 3.50 | $ 6.00 |
| 5. Net State High Cost Support per line | L1 – (L2+L3+L4) | $ 22.27 | $ 6.52 |
| | | | |
| 6. State USF lines as of 12/31/2001 | Company Records | 11,500 | 2,500 |
| | | | |
| 7. State High Cost Support | L5 * L6 | $ 256,105 | $ 16,300 |
| 8. Total State High Cost Support per month | L7 (Col. A + Col. B) | $ 272,405 | |
| | | | |
| 9. State Lifeline Support per line | SC Commission | $ 3.50 | |
| 10. Number of Lifeline Customers | Company Records | 100 | |
| 11. State Lifeline Support | L9 * L10 | $ 350.00 | |
| 12. Administrative Expense, allocated to each ILEC | SC Commission | | |
| | | | |
| 13. State USF Support | L8 + L11 + L 12 | $ 272,755 | |
| | | | |
| 14. Maximum Percentage of State USF for the initial phase | Admin. Proc. | 33.33 % | |
| 15. State USF cap amount for the initial phase | L13 * L14 | $ 90,909 | |
| 16. High Cost Support per line per month from the first step | Att. III, L7 | $ 4.91 | $ 1.44 |
| 17. High Cost Support from the first step per month | L16 * L 6 | $ 56,465 | $ 3,600 |
| 18. Total High Cost Support from the first step | L17 (Col. A + Col. B) | $ 60,065 | |
| | | | |
| 19. Max. Revenue Reductions available for second step | L15 – (L11+L12+L18) | $ 30,494 | |
| | | | |
| **I.B. Calculation for Step 2 of phase I:** | | | |
| | | | |
| 20. Revenue Reduction as the result of reducing tariffed rate | Approved Tariff | $20,000 | |
| | | | |
| 21. Revenue reduction as the percentage of the High Cost Support | L20 / L8 | 7.34 % | |
| 22. Incremental High Cost Support per line for the second step | L21 * L5 | $ 1.63 | $ 0.48 |
| 23. Cumulative High Cost Support per Line | L16 + L22 | $ 6.54 | $ 1.92 |

ATTACHMENT V

**Example of Second and Subsequent Phase Calculation**
South Carolina State USF Calculation

| **Adjustment to the High Cost Support for 10/1/2003** | **Source** | *Col. A* **Residence** | *Col. B* **Business** |
|---|---|---|---|
| Data as of 12/31/2002 – Reported by 7/1/2003 | | | |
| 1. Cost per line, approved by the Commission | SC USF Order | $ 41.52 | $ 41.52 |
| 2. Authorized Maximum Rate | Approved Tariff | $ 15.00 | $ 30.00 |
| 3. Federal per line USF support | FCC | $ 3.00 | $ 3.00 |
| 4. Subscriber Line Charge | FCC | $ 3.50 | $ 6.00 |
| 5. Net State High Cost Support per line | L1 – (L2+L3+L4) | $ 20.02 | $ 2.52 |
| | | | |
| 6. State USF lines as of 12/31/2002 | Company Records | 12,250 | 2,800 |
| | | | |
| 7. State High Cost Support | L5 * L6 | $ 245,245 | $ 7,056 |
| 8. Total State High Cost Support per month | L7 (Col. A + Col. B) | $ 252,301 | |
| | | | |
| 9. State Lifeline Support per line | SC Commission | $ 3.50 | |
| 10. Number of Lifeline Customers | Company Records | 105 | |
| 11. State Lifeline Support | L9 * L10 | $ 367.50 | |
| 12. Administrative Expense, allocated to each ILEC | SC Commission | | |
| | | | |
| 13. State USF Support | L8 + L11 + L 12 | $ 252,669 | |
| | | | |
| 14. Max. Percentage of State USF for this phase | Admin. Proc. | 66.67 % | |
| 15. State USF cap amount for this phase | L13 * L14 | $ 168,454 | |
| 16. High Cost Support per line per month from previous phases | Att. IV, L23 | $ 6.54 | $ 1.92 |
| 17. Cumulative High Cost Support per month from previous phases | L16 * L 6 | $ 80,115 | $ 5,376 |
| 18. Total High Cost Support per month for previous phases | L17 (Col. A + Col. B) | $ 85,491 | |
| | | | |
| 19. Max. Revenue Reductions available for this phase | L15 – (L11+L12+L18) | $ 82,596 | |
| | | | |
| **II.A. Calculation for This Phase Tariff Reductions:** | | | |
| | | | |
| 20. Revenue Reductions | Approved Tariff | $ 40,000 | |
| | | | |
| 21. Revenue reduction as the percentage of the High Cost Support | L20 / L8 | 15.85 % | |